**In re McLEAN INDUSTRIES, INC., et al., Debtors.**

**Bankruptcy No. 86 B 12238–41.**

United States Bankruptcy Court, S.D. New York.

Aug. 19, 1987.

Milbank, Tweed, Hadley & McCloy by Alan W. Kornberg, Risa Rosenberg, New York City, for debtors-in-possession.

Weil, Gotshal & Manges by Corinne Ball, Jay Goffman, Kevin Hughes, Jacqueline Taubes, New York City, for Prudential Ins. Co. of America.

White & Case by Alan L. Gropper, James P. Laughlin, New York City, for Creditors Committee.

DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

First Colony Farms, Inc. ("First Colony"), one of the four affiliated debtors and debtors-in-possession (the "Debtors") in these four Chapter 11 cases, seeks an ex-

tension pursuant to 11 U.S.C. § 1121(d) (1986) of its exclusive periods for filing a plan of reorganization and soliciting acceptances. The motion is supported by the Unsecured Creditors Committee. The Prudential Insurance Company of America ("Prudential") objected to the motion and an evidentiary hearing was held on July 15, 1987. The following constitutes this Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

### *The Chapter 11 Cases*

1. On November 24, 1986, First Colony and its affiliates, McLean Industries, Inc. ("McLean"), United States Lines, Inc. ("U.S. Lines") and United States Lines (S.A.), Inc. ("U.S. Lines (S.A.)"), each filed a petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). One firm of attorneys represents all four Debtors whose cases have been consolidated for procedural purposes. Since the petition date, the Debtors have continued to manage their properties as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code, and no trustee or examiner has been appointed for any of them.

2. First Colony is a wholly-owned subsidiary of McLean. It owns all the outstanding common stock issued by U.S. Lines. All of the outstanding stock issued of First Colony has been pledged to Prudential by McLean to secure an obligation in the approximate amount of $93 million incurred pursuant to a guaranty (the "Guaranty") by First Colony and McLean of certain U.S. Lines' obligations. Prudential also holds other substantial claims against U.S. Lines and McLean.

3. U.S. Lines and U.S. Lines (S.A.), in combination, operated one of the largest container lines and cargo shipping companies in the world.

4. In combination, these four cases are highly complex. The Court takes judicial notice of the Debtors' Consolidated Docket which, as of July 23, 1987, contained 845 numbered entries, exclusive of proofs of claim and adversary proceedings. Thirty-one of those entries relate to First Colony. The docket discloses that these four cases have been highly active and require extensive work by Debtors' counsel.

### *The Motion*

5. On March 23, 1987, the Debtors' exclusive periods under 11 U.S.C. § 1121 were extended consensually to June 22, 1987 for filing a plan of reorganization and to August 21, 1987 for soliciting acceptances. On June 12, 1987, the Debtors, including First Colony, filed the Motion seeking a further 90–day extension of their exclusive periods.

6. On June 22, 1987, this Court entered an order granting the Motion with respect to all the Debtors except First Colony and extending First Colony's exclusive period to file a plan of reorganization until five days after entry of an order resolving the motion and the exclusive period to solicit acceptances to October 13, 1987.

7. At the July 15, 1987 hearing, only the testimony of Hobart G. Truesdell, II was presented together with certain exhibits. Truesdell has been President of First Colony since 1977, and since July 1, 1987, has been the President of the other three Debtors. Transcript of July 15, 1987 hearing (hereinafter, the "Transcript"), at p. 12.

### *First Colony's Operations*

8. First Colony owns undeveloped land consisting of 103,000 acres in North Carolina and 24,000 acres in Alabama. Transcript at p. 15. In more than two dozen transactions over the past ten years, First Colony has sold or disposed of more than 200,000 acres. Transcript at pp. 15, 31 and 32. First Colony's historic business has been that of managing vast parcels of land and devising and implementing plans for their use and disposition. Transcript at p. 15. In addition, First Colony formerly participated with Prudential in a joint venture involving 125,000 acres. It managed that property and arranged for its disposition. Transcript at pp. 32–36. Currently, First Colony manages approximately 30,000 acres of agricultural land owned by Pru-

dential under a contract that provides it with a fee of at least $6,000 per month. Transcript at pp. 35–38. In addition to these activities, First Colony sells peat reserves, enters into timber contracts, leases land to tenant farmers, and arranges for the harvesting of pecans. Transcript at pp. 16, 24, 28 and 29.

9. In addition to these activities and assets, First Colony owns a receivable from the lease of certain land to Tyson Foods (the "Tyson Receivable"), and cash proceeds from the pre-petition sales of Sea-Land Corporation and R.J. Reynolds Co. Transcript at pp. 58–59, Exh. C. p. 8.

10. First Colony has ten employees. Transcript at p. 59. Including potential claims arising by operation, but excluding the threatened claims of numerous seamen on a "control group theory", First Colony has less than twenty creditors. Transcript at pp. 79–80. The secured debt is principally held by two entities: Prudential and John Hancock Company. The Prudential Guaranty is apparently collateralized by First Colony's North Carolina property, having an estimated value of $16–28.7 million. Transcript at pp. 17, 58. The John Hancock debt of approximately $9.5 million is apparently collateralized by the Alabama property, having an estimated value of $17.5–21 million. Transcript pp. 15, 58.

11. Prior to bankruptcy, First Colony filed consolidated tax returns with the other debtors and owes approximately $9.5 million to McLean as a result of a tax sharing agreement. McLean owes approximately $9.7 million to First Colony as a result of a loan.

12. First Colony did not have an operating profit in 1986, and does not anticipate having a net operating profit in 1987. Transcript at p. 65. It posted a net loss for 1987, through May 23, 1987 of $679,759.01, including unpaid interest of $601,040.44. Exhibit B pp. 2, 3. That loss apparently does not include any payments on the Tyson Receivable (see Exhibit B, p. 2), which payments are due semi-annually and amount to $420,000 per year (Exhibit C pp. 7, 8). First Colony's 1987 budget forecasts a positive cash flow of $213,303 (Exhibit C, p. 7).

13. First Colony has developed a business plan, Debtor's Exhibit 1 (the "Business Plan"), designed to preserve and enhance the value of First Colony's assets by utilizing management's expertise in developing plans for the disposition and marketing of First Colony's land and other property over a one to two year period. Transcript at pp. 17, 18, 44, 52 and 53.

14. First Colony has made the Business Plan available to its creditors for comment and has discussed it with representatives of the Committee and Prudential. Transcript at pp. 47–51. Prudential finds the Business Plan acceptable. Transcript at pp. 104–05, 110. It desires to file a plan of reorganization providing for distribution of the eventual proceeds.

15. First Colony's management has not been inattentive or negligent in its treatment of First Colony's assets and estate. Management has reduced overhead to a minimum, Transcript at pp. 31, 89, and the Business Plan contemplates payment of current bills as they come due. First Colony's real estate assets are being preserved and are increasing in value by, among other things, growth of marketable timber. Transcript at p. 54. There is no evidence that it desires to retain exclusivity in order to pressure creditors to accede to its reorganization demands.

16. Were First Colony required to immediately liquidate its holdings, it would continue to incur current operating expenses, those listed in the Business Plan, and the additional expense of hiring a liquidator. Transcript at p. 89. Forced sales of its assets would result in greatly reduced sales proceeds. Transcript at pp. 18, 19. Although Prudential complains that the Tyson Receivable is being utilized to fund current operations, those operations are necessary to achieve practicable disposition of the assets. Regardless of whether a plan is to be filed immediately, or in the future, the expenses of maintaining the properties will be incurred.

17. Prudential has sought neither relief from the automatic stay nor conversion of the First Colony case to Chapter 7. Were

relief from the stay granted, it would have to bear the expense of maintaining and selling the North Carolina property. Were the case converted, the estate would incur the expense of a trustee and the professionals engaged by a trustee in addition to the expense of maintaining the properties.

### Complexities of this Case

18. The Debtors, including First Colony, have substantial net operating loss tax carry forwards ("NOL's"). Utilizing them may involve a consolidated reorganization that continues First Colony's historic business activities in part. Such a reorganization could result in increased returns for all creditors, including First Colony's. Transcript at pp. 99–103.

19. The status and amount of Prudential's claim against First Colony will be affected by the treatment of Prudential's claims in the McLean and U.S. Lines cases. Substantial questions have been raised about the status of Prudential's security interests in certain assets of U.S. Lines. *See* Docket Entries 637, 738, 700, 701, 709, 710, 711, 714, 715, 727, 730, 755, 758, 765, 781, 797, 798, 799, 805, 807 and 812, and this Court's opinion of July 29, 1987. The status of Prudential's security interests will directly affect its recovery from the estate of U.S. Lines, thereby directly increasing or decreasing Prudential's guaranty claim against First Colony and the status of First Colony's subrogation rights.

20. Complex legal and factual issues need to be resolved or be close to resolution before First Colony can negotiate the terms of a plan of reorganization, meaningful disclosure can be made to creditors, and creditors able to determine what they will receive. They include: (i) liquidation of First Colony's Guaranty obligation to Prudential; (ii) estimation of First Colony's subrogation claim, if any, for payment under its guaranty; (iii) quantification, preservation and utilization of First Colony's NOL; (iv) estimation of claims against First Colony by seamen on account of alleged "control group" liability arising from First Colony's relationship with U.S. Lines and McLean; and (v) valuation of First Colony's assets and the liens against those assets.

21. In light of the complexity of the four cases which have been procedurally consolidated, First Colony has been diligent in attempting to resolve these issues and formulate a plan of reorganization.

### CONCLUSIONS OF LAW

1. The exclusive rights of Chapter 11 debtors to file a plan of reorganization within 120 days of the commencement of the case and to have the plan accepted within an additional 60 days, together with the court's discretionary authority to increase or reduce these periods, are delineated in 11 U.S.C. § 1121(b), (c)(3) and (d) as follows:

> (b) Except as otherwise provided in this section, only the debtor may file a plan until 120 days after the date of the order for relief under this chapter.
>
> (c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.
>
> (d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120–day period or the 180–day period referred to in this section.

2. The term "cause" is undefined by the statute. The legislative history indicates that it is to be viewed flexibly "in order to allow the debtor to reach an agreement." H.R.Rep. No. 595, 95th Cong., 2d Sess. 231 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6190. To that notion, this Court, in *In re Texaco, Inc.*, 76 B.R. 322, 327 (Bankr.S.D.N.Y.1987), has added two additional concerns:

(i) that the unsecured creditors committee also have "an opportunity to review and

negotiate an acceptable plan", and (ii) substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan. *Ibid.*

Accordingly, in that large case this Court granted a 120–day and 180–day extension of the exclusive periods provided by § 1121(b) and (c), even though the largest creditor sought to file a plan leaving all creditors except itself unimpaired and paying itself $4.1 billion in settlement of an $8 billion judgment.

■ 3. A reasonable time in light of the bankruptcy case in its entirety is the root consideration. In establishing cause, the debtor bears the burden of proof. Extensions are not to be granted neither routinely nor cavalierly. But, where the exclusive period is insufficient because of extraneous factors, exclusivity should be continued. *In re Swatara Coal Co.*, 49 B.R. 898, 899–900 (Bankr.E.D.Pa.1985) (debtor's present owners did not acquire control until nearly three months after commencement of case, at which time schedules for the debtor still remained to be filed). Conversely, where a debtor is wasting its opportunity, or is incapable of formulating a plan, exclusivity will be shortened. *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160–161 (Bankr.D. Maine 1982) (where exclusivity would end concurrently with the busy season of a seasonal business and debtor was unable to reach consensus, exclusive period would be shortened to allow more objective parties to file plan); *In re Tony Downs Foods Co.*, 34 B.R. 405, 407 (Bankr.D.Minn.1983) (debtor's unsupported allegation that it needed more time to formulate plan was insufficient cause to extend exclusivity).

■ 4. In finding cause, courts have relied on, in addition to the need of the creditors committee to negotiate with the debtor and the ability to prepare adequate information: (a) the size and complexity of the debtor's case, *Gaines v. Perkins (In re Perkins)*, 71 B.R. 294, 297–99 (W.D.Tenn. 1987); *In re United Press Int'l, Inc.*, 60 B.R. 265, 269 (Bankr.D.D.C.1986); (b) the existence of good faith progress towards reorganization, *In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr.E.D.Pa.1986); *In re Swatara Coal Co.*, 49 B.R. at 900; (c) a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the debtors] reorganization demands," *In re Pine Run Trust, Inc.*, 67 B.R. at 435; (d) existence of an unresolved contingency, *In re Swatara Coal Co.*, 49 B.R. at 899–900; and (e) the fact that the debtor is paying its bills as they come due, *In re Trainer's, Inc.*, 17 B.R. 246, 247 (Bankr.E.D.Pa.1982).

5. Where cause has not been found, the cases have concerned: (a) substantial ongoing cash losses, *In re Ravenna Industries, Inc.*, 20 B.R. 886, 890 (Bankr.N.D.Ohio 1982); (b) the length of previous extensions of exclusivity, *Teachers Insurance and Annuity Association of America v. Lake in the Woods (In re Lake in the Woods)*, 10 B.R. 338, 345 (E.D.Mich.1981) (exclusivity extended to one and one-half years with stated intention to continue extension indefinitely); *In re Ravenna Industries, Inc.*, 20 B.R. at 890 (the debtor had been granted eight extensions bringing the total exclusive period to 435 days); (c) the use of exclusivity to pressure a creditor "to accede to [the debtor's] point of view on an issue in dispute." *In re Lake in the Woods*, 10 B.R. at 346; (d) the mere pendency of an appeal from an adverse judgment, *In re American Federation of Television and Radio Artists*, 30 B.R. 772, 774 (Bankr.S.D.N.Y.1983); (e) lack of complexity, *id.*

6. Here, there may be a small number of creditors and lack of profits but the case is nevertheless complex and requires considerably further study before a plan of reorganization could be proposed and intelligently communicated to creditors for their acceptance. It is no answer, in this case, to note the rule that a creditor may look to a guarantor for full payment. *See, e.g., In re United Cigar Stores Co.*, 73 F.2d 296, 297 (2d Cir.1934), *cert. denied sub nom. Irving Trust Co. v. Bankers Trust Co.*, 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1935). The point remains that, in light of the large sum of approximately $93 million claimed by Prudential against its primary obligor,

U.S. Lines, First Colony's guaranty of that obligation and assets in this case of far less than that amount, creditors in the First Colony case will have little if any guidance as to the size of the dividend they would receive under any plan in this case. If there is anything that falls under the rubric of "adequate information" required by § 1125(a) of the Bankruptcy Code to be contained in a disclosure statement, it is an approximation of the dividend payable to each unsecured creditor. Indeed, this Court has summarily rejected from the bench disclosure statements failing to contain that information.

7. Secondly, this is a case on file less than a year. While in many cases 10 months would be more than sufficient, it can hardly be expected that this estate's highly unliquid assets would be marketed and sold in that time or that the optimal way to utilize its NOLs, would have been determined. *See* Henderson and Goldring, *Failing and Failed Businesses* ¶ 102 (CCH Tax Transactions Library 1987) at 305. At this stage that need constitutes cause. Conversely, that Prudential finds the Business Plan acceptable demonstrates that this is not a case where exclusivity is sought to pressure it or other creditors.

8. In addition, the complex nature and the size and volume of proceedings in related cases can constitute cause for the extension of exclusivity. *In re Manville Forest Products Corp.*, 31 B.R. 991, 995 (S.D.N.Y. 1983) (district court dismissed appeals from an order granting a fifth extension amounting to a total of 225 days after the 120 day period stating "[t]he sheer mass, weight, volume and complication of the Manville filings undoubtedly justify a shakedown period."). Here involved is an equally complex set of cases involving hearings held on virtually a weekly basis and requiring the unstinting performance of exceptionally skilled counsel on all sides. That First Colony has at least pointed itself in a direction whereby it can negotiate with its creditors is, in these overall circumstances, to be commended.

9. None of this is to say, however, that the exclusivity period is to be maintained indefinitely as Prudential apparently fears. The need of the Debtor and the creditors committee to study and negotiate under the exclusivity umbrella and the need for clarification of Prudential's status cannot justify indefinite extensions or extensions to the prejudice of others. But, here, no prejudice has been shown. This is not a case where, for example, the debtor will be unable to care for its assets and yet insists on maintaining the exclusive right to propose a plan. Nor is this a case where the debtor has lost sight of the need to deal with its creditors. Rather, this is a case where the debtor has at least preliminarily indicated its direction, and the objectant agrees with that direction. That cash is being used to maintain other assets is no prejudice here. Whether a plan of reorganization is filed now or later, those assets will have to be maintained until they are sold, if that is the ultimate course taken. Moreover, these four cases are cases where, to use Judge Leval's metaphor, the smoke may be beginning to clear, *see Manville Forest Products*, 31 B.R. at 995, thus enabling meaningful negotiations to take place.

10. The Debtor has established cause under § 1121(d). Therefore, the motion is to be granted.

SETTLE ORDER.