**In re McLEAN INDUSTRIES, INC., et al., Debtors.**

**McLEAN INDUSTRIES, INC., f/k/a McLean Securities, Inc., Plaintiff,**

v.

**MEDICAL LABORATORY AUTOMATION, INC., Defendant.**

**Bankruptcy Nos. 86 B 12238 through 86 B 12241 (HCB). Adv. No. 87–5987A.**

United States Bankruptcy Court, S.D. New York.

Feb. 14, 1989.

See also, Bkrtcy., 88 B.R. 36.

Milbank, Tweed, Hadley & McCloy by Henry Condell, New York City, for debtors.

Kronish, Lieb, Weiner & Hellman by Lawrence J. Kaiser, David Rosenzweig, New York City, for Official Debentureholders Committee.

Day, Berry & Howard by James J. Tancredi, Hartford, Conn., for defendant.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

This adversary proceeding, commenced by the Debtor, McLean Industries, Inc. ("McLean" or "Debtor"), seeks a judgment of specific performance compelling Medical Laboratory Automation, Inc. ("MLA") to issue shares of stock pursuant to an option held by McLean. Three principal issues of bankruptcy administration are raised: whether an entity that is neither a creditor nor a shareholder may refuse to perform a pre-petition option timely exercised by the Debtor on the grounds that (i) the Debtor failed to give notice to creditors as required by 11 U.S.C. § 363(b)(1), (ii) the expenditure of funds to exercise might not qualify under 11 U.S.C. § 345 and (iii) the Debtor has yet to assume the Agreement in which the Option is contained. Jurisdiction over this adversary proceeding is vested in this Court pursuant to 28 U.S.C. § 1334 and § 157(b)(1).[1] Trial on stipulated facts was held on January 4, 1989.

### I

McLean is a holding company. Its principal direct and indirect subsidiaries are two former exceptionally large shipping companies known as United States Lines, Inc. and United States Lines (S.A.), Inc. These three companies and another subsidiary filed bankruptcy petitions with this Court on November 24, 1986 under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* (1986) (the "Bankruptcy Code" or the "Code") and have continued as debtors-in-possession pursuant to §§ 1107 and 1108 of the Code. McLean has other subsidiary companies and owns stock in other publicly traded companies. Exhibits A, D.[2] For

---

1. These assertions by MLA concerning the alleged failure to comply with Sections 363(b)(1) and 365(a) confirm that this ancillary proceeding is a core proceeding since the issues raised are "matters concerning the administration of the estate" as set forth in 28 U.S.C. § 157(b)(2)(A).

2. References to Exhibits and deposition transcripts are to the exhibits and transcripts received in evidence. References to Stipulation

general descriptions of these estates, *see In re McLean Industries, Inc.* 70 B.R. 852 (Bankr.S.D.N.Y.1987); *In re McLean Industries, Inc.*, 87 B.R. 830 (Bankr.S.D.N.Y. 1987).

MLA is a closely held corporation organized under the laws of New York with its principal place of business in Pleasantville, New York. Stipulation ¶ 4. Its stock is privately held and is not traded on any public exchange or market. Stipulation ¶¶ 4, 32. MLA is not a creditor or equity holder in any of these Chapter 11 cases and has not filed a proof of claim or interest. Stipulation ¶¶ 9, 38.

McLean entered into a sales contract (the "Agreement") on April 13, 1977 with MLA under which McLean sold and MLA purchased Mobilizer Medical Products ("MMP"), a wholly owned subsidiary of McLean. Stipulation ¶ 16. In the Agreement, McLean received, *inter alia*, an option to purchase up to 7½% of MLA's outstanding stock or 64,344 shares at a price of $5.28 per share (the "Option"). Exhibit I, ¶¶ 5(a), (b). Upon any partial or full exercise of the Option by McLean, MLA agreed to issue the number of shares being purchased in the following proportions: two thirds (⅔) Class A Common Stock (voting), $.01 par value and one-third (⅓) convertible Class B (non-voting), $.01 par value (the "Option Stock"). *Ibid.* The Option was exercisable for a period of 10 years from the date of the Agreement. *Id.*, ¶ 5.

Malcolm P. McLean is the founder of McLean, owner of the bulk of its outstanding stock and long time Chairman of its Board of Directors. In October 1986, McLean's controller, Kevin J. Baxley, consulted a stock analysis service report regarding the medical supply industry, examined MLA's financial statements and estimated the MLA shares subject to the Option to be worth $1,708,453.00 after subtracting the Option exercise price. Exhibit J. In an October 1986 interoffice memorandum, Mr. McLean instructed Baxley, "Kevin, let's stay on top of our right to buy this stock and not let this date slip by," Exhibit K, and then or some time later ordered the

Option be exercised. Hiltzheimer Deposition 52. In the Spring of 1987, the then Secretary and Assistant Treasurer of McLean, John D. McCown, estimated the value of the MLA stock subject to the Option to be worth over $2 million. McCown Deposition 114.

On or about April 8, 1987, Allen L. Stevens, Vice President and Treasurer of McLean, sent written notice to MLA informing it of McLean's exercise of the Option to purchase 64,344 shares of MLA stock and tendered a certified check in the amount of $339,736.32. Exhibit M. That same letter rejected an offer by MLA to purchase the Option for $25,000. On April 24, 1987, counsel for MLA responded to McLean's tender in a letter stating that the exercise of the Option was ineffective since it was outside of the ordinary course of business and therefore required prior bankruptcy court approval. Exhibit N. The letter indicated that McLean's certified check was to be returned to McLean.

A special meeting of McLean's Board of Directors was held on April 28, 1987. Exhibit P. While not on the agenda for the meeting, McLean's exercise of the Option and MLA's refusal to issue the stock were discussed. Although Stevens had informed the Chief Executive Officer of McLean, Charles Hiltzheimer, of the existence of the Option in an informal conversation in March of 1987, Hiltzheimer Deposition 43–44, and thought Hiltzheimer had approved its exercise, McCown Deposition 133–34, Hiltzheimer advised the Board that Mr. Stevens' letter of April 8, 1987 was sent and the check for $339,736.32 was issued without his knowledge. Exhibit P at 2. Hiltzheimer accordingly became angry and embarassed because a matter of which he was unaware or had forgotten, Hiltzheimer Deposition 44, came up before the Board and he had not so informed the creditors committee. Hiltzheimer Deposition 48–55. The minutes of the meeting indicate that Hiltzheimer was given assurance that no further actions of this type would be taken without his approval. Exhibit P at 2.

are to the Stipulation of Facts entered into by the parties.

Hiltzheimer's anger was not aroused by the business judgment behind the exercise of the Option, but rather, at the lack of courtesy demonstrated towards him in failing, in his view, to notify him of the exercise of the Option. Hiltzheimer Deposition 52. He was more concerned with the form than with the substance and Mr. McLean apologized for the lack of courtesy. *Id.* at 55.

Hiltzheimer's uneasiness was undoubtedly attributable to his having come to McLean and United States Lines as chief executive officer in November of 1986 on the eve of the filing of the Chapter 11 petitions. McCown Deposition 67. The United States Lines and United States Lines (S.A.) cases were in a crisis mode requiring urgency, Hiltzheimer Deposition 42, and the environment was chaotic. *Id.* at 24. Hiltzheimer's "primary emphasis ... was to determine if [he] could salvage something of value out of the U.S. Lines operation and that's where the focus, [his] focus was. About 99 percent." *Id.* at 42 lines 23–25, 43 lines 1–3.

Against this backdrop, Hiltzheimer's expression of anger at not being informed of McLean's exercise of the Option "was simply that it was poor communication and that I should have been consulted and have (sic) knowledge of it prior to it being communicated to my board." *Id.* at 52, lines 16–19. He did acknowledge that the exercise of the Option had been authorized by Mr. McLean, *id.* at 52, lines 22–24, and that, in his opinion, the exercise of the Option would be favorable to McLean. *Id.* at 57, lines 4–19.

McLean has not yet assumed the Agreement in which the Option is contained but intends to do so prior to or in connection with confirmation of a plan of reorganization. To provide it with a floor price, thereby ensuring that the Debtor will not lose money from having exercised the Option, McLean entered into a letter agreement dated May 19, 1987, as restated in a letter dated December 17, 1987, with Mr. McLean. He agreed to purchase from the Debtor the Option Stock for $365,736.22. Exhibit Q. That letter agreement does not obligate the Debtor to sell the Option Stock to Mr. McLean. Debtor's counsel affirms that any such sale will be only after notice and hearing.

Conceding that McLean's letter exercising the Option and the tender of its check for the Option price were timely, MLA raises a host of unpleaded objections, ranging from the allegation that the transaction was unauthorized to the assertion that a subsequent sale to Mr. McLean, if approved by this Court, would violate S.E.C. Rule 144, 17 C.F.R. Ch. II § 230.144 (April 1, 1988). Its principal assertions are, however: (i) that the exercise of the Option and the expenditure of cash constituted the use of estate property not in the ordinary course of business and thus violative of § 363(b)(1) of the Bankruptcy Code, 11 U.S. C. § 363(b), (ii) that the investment of cash belonging to the estate was not in compliance with § 345, 11 U.S.C. § 345, and (iii) that the Agreement, of which the Option is a part, is an executory contract and cannot be enforced by a debtor-in-possession prior to its assumption pursuant to § 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a). To these assertions it adds that the supposed violations of §§ 363(b)(1) and 365 cannot be cured since the time within which to exercise the Option has expired.

## II

As to the first of these contentions, § 363 distinguishes between actions by a debtor-in-possession with respect to estate property on the basis of whether such actions are within the ordinary course of business. If so, § 363(c)(1) provides that no notice to creditors is required. 11 U.S. C. § 363(c)(1). If not, § 363(b)(1) provides:

> The trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b)(1). McLean asserts that MLA, as neither a creditor nor a shareholder of the Debtor, lacks standing to refuse to issue shares upon its exercise of the Option on grounds of lack of compliance

with § 363(b)(1)[3] and that in any event, §§ 363(b)(1) and 363(c)(1) were complied with since the exercise of the Option and tender were in the ordinary course of its business. Because we agree that MLA is not "within the zone of interests to be protected or regulated" by § 363(b)(1), *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), and thus the alleged violation of § 363(b)(1) is immaterial to this adversary proceeding, we do not decide whether the exercise of the Option and tender were in the ordinary course of business.

Section 363(b)(1) plainly reflects the congressional intention that a debtor-in-possession, having the powers of a trustee pursuant to Bankruptcy Code § 1107 and the authority to operate the debtor's business pursuant to Bankruptcy Code § 1108, be barred from removing the horse from the barn prior to notifying parties in interest and affording them an opportunity to be heard before the court. Key to § 363(b)(1) are the phrases "ordinary course of business," which raises notions of behavior extraordinary in terms of creditor expectation, the debtor's affairs and the behavior of similar entities, *see e.g. In re Johns Manville Corp.*, 60 B.R. 612, 615 (Bankr.S.D.N.Y.1986), and "notice and hearing".

The term "notice and hearing" is defined by Bankruptcy Code § 102(1) to require notice as is appropriate and an opportunity to be heard; if no objections are filed, no court order permitting the sale, use or lease of property is required. 2 L. King, K. Klee, R. Levin, H. Miller & P. Murphy, *Collier on Bankruptcy* ¶ 363.03 (1988).

The notice required is that set by Rule 2002 of the Rules of Bankruptcy Procedure. *Ibid.* That rule, in delineating the parties in interest who are to receive notice of various matters, requires notice to "the debtor, trustee, all creditors and indenture trustees" of a proposed use, sale or lease of property under § 363(b)(1), *see* Rule 2002(a)(2), and notice to equity security holders of the hearing on the proposed sale of all substantially all of the debtor's assets. *See* Rule 2002(d).[4]

Significantly missing from this enumeration are entities, such as MLA, who are neither creditors nor shareholders. They simply have no interest in the issue of whether the property of the estate is to be used, sold or leased. Creditors, however, have such an interest. *See In re Sapolin Paints, Inc.*, 11 B.R. 930, 936 (Bankr.E.D.N.Y.1981) (purpose of notice and hearing to creditors for transaction outside of the ordinary course of business "is to give creditors, who have a vital interest in the maximum realization from the assets of the estate, an opportunity to review the terms of the proposed sale, and to object thereto, if they deem the terms and conditions not to be in their best interests.") The dividends payable to unsecured creditors could be sharply affected by improvident debtor transactions out of the ordinary course of business. Shareholders have a similar interest in the sale of all or a substantial portion of a debtor's assets. They may be deprived of the going concern value of a reorganized entity that will enable them to retain an interest.

From the words of the statute, identification of its self-evident purpose and exami-

---

**3.** MLA does not dispute that the issue of its standing to invoke the benefits of § 363(b)(1) is properly before the Court, *see* MLA Memorandum at 46, even though it was the debtor that pleaded that the transaction was in the ordinary course of business, seemingly because Plaintiff's prima facie case in this instance of a completed sale is apparently based on merely the existence of the Option and its timely exercise. *See* 5 C. Wright & A. Miller *Federal Practice and Procedure* § 1235 (1969). The Debtor makes no claim that the defense was waived by MLA through having failed to plead, as a "matter constituting an avoidance" under F.R.C.P. Rule 8(c), 5 Wright & Miller, *supra,* § 1271, that the

exercise of the Option was not in the ordinary course of business. *See Tacoma Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Tacoma Boatbuilding Co. (In re Tacoma Boatbuilding Co.),* 81 B.R. 248, 259–60 (Bankr.S.D.N.Y.1987). 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.27[3] (2d ed.1983).

**4.** In cases where it is sought to sell property free and clear of liens, a contested proceeding under Rule 9014 is also required. Sale of both the interest of the estate and a co-debtor under § 363(b) requires commencement of an adversary proceeding. Rule 7001.

nation of the rules precisely drawn to implement that purpose, it is thus clear that MLA has no legally cognizable interest in its alleged violation. If § 363(b)(1) were violated, it was in the failure to give notice to others, not MLA, of the proposed exercise of the Option and payment of cash and to afford them an opportunity to be heard.

Performing the exercise in terms of "party in interest" as that term is employed in § 1109(b) of the Bankruptcy Code leads to the same conclusion. That section states that

> [a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b). The exemplary terms thus define a party in interest as one having a stake in the outcome of the bankruptcy case, *e.g. In re Athos Steel & Aluminum, Inc.*, 69 B.R. 515, 519 (Bankr.E.D. Pa.1987), or a right at issue in a particular proceeding. *E.g., In re Goldman*, 82 B.R. 894, 895–96, (Bankr.S.D.Ohio 1988). In any particular matter, moreover, interpretation of the term "party in interest" is "governed by the Code's purposes." *Roslyn Savings Bank v. Comcoach Corp., (In re Comcoach Corp.)*, 698 F.2d 571, 573 (2d Cir.1983) (mortgage lender to landlord not a party in interest in tenant's bankruptcy case.) Here, the purpose of § 363(b)(1) is to protect creditors and shareholders. Not being either, MLA is not "one who, under the applicable substantive law, has the legal right which is sought to be enforced...." *Comcoach*, 698 F.2d at 573 (citations omitted).

In defense of its attempt to bootstrap its refusal of McLean's exercise of the Option to the failure to notify creditors, MLA makes three principal assertions. First, it asserts that standing, as interpreted in *In re GEM de Puerto Rico, Inc.*, 79 B.R. 142 (D.P.R.1987) is not so limited. Second, it contends that "rules are rules" and bankruptcy constraints should be enforced against a debtor-in-possession regardless of

standing. Third, it asserts that it has an interest in the Debtor's compliance with § 363(b)(1) because the exercise of the Option and its concomitant payment of cash might be subsequently challenged. These arguments are without merit.

In *In re GEM de Puerto Rico*, the debtor-in-possession entered into an agreement, without consideration or court order, under which it transferred back leased premises to its landlord who, in turn, leased them to another. Thereafter, the landlord entered into an option to lease and purchase the same premises to a fourth party and assigned the debtor's lease to the fourth party. The fourth party sought to set aside the initial transaction, between the debtor and the landlord, on grounds of lack of consideration. The Bankruptcy Court held that only a trustee could bring a fraudulent transfer case under § 548 of the Bankruptcy Code and thus the fourth party lacked standing. In reversing, the district court held that the fourth party was an interested party. The reasons for the holding are not set forth but it is clear that the fourth party had an economic stake as assignee of the debtor's lease of the premises. According to the court, approval of the Debtor's contract "would subject the rights and interests of [the fourth party] in the leased premises ..." and the fourth party "would bear the brunt of the pecuniary loss caused by GEM's petition in bankruptcy." 79 B.R. at 144. Here, entities other than MLA are to bear that loss.

Consequently, MLA reverts to its argument that "rules are rules" and this Court, regardless of the absence of an objection by a party with standing, should not tolerate their violation. However appealing is that sophomorism, it ignores the precept that the judicial process is founded on the notion of adversaries asserting a violation of their own interests and not those of someone else whom they do not represent. Absent such, they lack standing. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d

595 (1978); *Application of Dow Jones & Co., Inc.,* 842 F.2d 603, 606, 607 (2d Cir. 1988); *cf. Burdick v. American Express Co.,* 865 F.2d 527 (2d Cir.1989) (dismissal of R.I.C.O. complaint filed by former broker-age house employee was proper where he failed to demonstrate that he had standing under 18 U.S.C. § 1964(c) (1982) since the type of harm he alleged was simply too remotely related to the alleged predicate R.I.C.O. acts.)

To be sure, § 1109 recognizes that in Chapter 11 cases certain entities are always affected and may be heard. But it is contrary to § 1109 and Congress having afforded standing to certain entities to say that the Bankruptcy Court, at the instance of one having no interest to be affected by the bankruptcy proceeding, should enforce the Code on its own. Bankruptcy judges were relieved of their administrative functions by the adoption of the Bankruptcy Code. The hearings before us are judicial in nature. *In re Gusam Restaurant Corp.,* 737 F.2d 274, 276–7 (2d Cir.1984). In certain instances, the bankruptcy courts are required, such as in considering whether to confirm a reorganization plan, *see In re Prudential Energy Corp.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986), and applications for professional compensation, *see In re Stable Mews Associates,* 49 B.R. 395, 398 (Bankr.S.D.N.Y.), *appeal dismissed,* 778 F.2d 121 (2d Cir.1985), to independently examine the matter regardless of the absence of an objection. Section 363(b)(1) is not one of these areas. It is designed to protect creditors and shareholders. The objection belongs to them.[5]

Apparently recognizing these constraints, MLA attempts to bolster its position by asserting that the exercise of the Option and tender of cash might be subject to attack by a creditor in light of the Debtor's failure to give notice. This argument is nothing more than a veiled desire to escape a contractual obligation by asserting a right belonging to creditors and thereby deprive those creditors of the considerable estimated benefit that exercise of the Option sought to achieve.

It cannot be gainsaid that a third party seeking to enter into a new, arguably out of the ordinary course of business, transaction with a debtor-in-possession would be well advised to condition that transaction on the debtor-in-possession's compliance with § 363(b)(1) in light of the risk of subsequent invalidity under § 549(a)(2)(B). *Cf., In re First Int'l. Services Corp.,* 25 B.R. 66 (Bankr.D.Conn.1982). (Debtor's sale of stock agreement voided on basis of, *inter alia,* its failure to comply with § 363(b) requirement of notice and hearing.) That section, also enacted to protect creditors, implements §§ 363(b)(1) and (c)(1) by enabling a trustee, within two years of the transaction, *see,* § 549(d), to avoid a transaction not authorized under the Code, *e.g.,* a transaction not within the ordinary course as provided in § 363(c)(1), or entered into without notice and hearing as provided in § 363(b)(1), or not authorized by the court. But the risk of avoidance by a trustee does not clothe a non-creditor with the rights of a creditor and thereby enable it to avoid a pre-existing contractual duty benefitting the estate. The shield protecting creditors is not a sword for a non-creditor. Particularly is that so here where the principal creditors of this Debtor, represented by the Official Debentureholders Committee, have appeared in this proceeding in support of the Debtor.

### IV

■ For the same reasons, MLA lacks standing to assert any purported violation of § 345. That section was enacted to give bankruptcy trustees flexability in investing estate funds, § 345(a), but *"[i]n order to protect the creditors,* subsection (b) requires certain precautions against loss of the money so deposited or invested." H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 333

---

5. In *In re GEM de Puerto Rico Inc.,* the district court added the *dictum* that the challenged transaction was voidable for failure to comply with § 363(b)(1). The court did not address the standing issue with respect to § 363(b)(1).

From the court's statement that the appellant would suffer the bulk of the injury through the debtor's bankruptcy, it would appear that the court considered the appellant to be a creditor.

(1977); S.Rep. No. 95–989, 95th Cong., 2nd Sess. 44 (1978) U.S.Code Cong. & Admin. News 1978, pp. 5787, 5830, 5963, 6289 (emphasis added). Those "precautions," require the trustee to obtain a secured bond in favor of the United States and thereby ensure that the funds will be available for distribution to creditors. *See* 11 U.S.C. § 345(b).

Thus, MLA is not within the zone of interests regulated or protected by § 345. *Camp*, 397 U.S. at 153, 90 S.Ct. at 829–30. Its rights are simply not affected by the alleged violation. That right belongs to· others, namely the creditors of this estate. Not one creditor has complained and the committee that represents the bulk of the debt supports the Debtor's expenditure of funds to exercise the Option.

## V

 Also without merit is MLA's assertion that, as a matter of law, the Debtor cannot enforce an executory contract prior to assuming it and therefore its exercise of the Option was ineffective.

McLean and MLA agree that the Agreement and the Option constitute a single indivisible contract. Both parties, furthermore, view this contract as an assumable executory contract.[6] Consequently, it is given that McLean may assume or reject the Agreement at any time prior to confirmation of a plan of reorganization, 11 U.S. C. § 365(d)(2), and MLA has failed to avail itself of making a motion, pursuant to § 365(d)(2), requesting that McLean's time to assume or reject the Agreement be shortened.[7]

Relying on *N.L.R.B. v. Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), MLA argues here that since the Debtor did not formally assume the Agreement pursuant to § 365(a) of the Code, it cannot seek to enforce the Option contained in it. *Bildisco* held, *inter alia*, that a pre-petition collective bargaining agreement was not enforceable against a debtor-in-possession prior to rejection and, that the debtor, therefore, had not violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (a)(5) (1974), by unilaterally changing the terms of the contract. 465 U.S. at 534. The Supreme Court reasoned that because of the "breathing space and flexibility" required by debtors-in-possession, "the filing of a petition in bankruptcy means that the [executory contract] is no longer immediately enforceable and may never be enforceable

---

6. While we accept the parties' assumption that the Agreement is an executory contract, we do so with some doubt. Professor Countryman has stated that an executory contract is "[a] contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach." Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN.L.REV. 439, 460 (1973). In the Agreement, McLean's only apparent continuing obligation is not to contest MLP patents. Those patents are at least eleven years old. The Agreement further contains a representation that if McLean exercises the Option, McLean will acquire the Option Stock for investment and not for distribution. Since, as noted *infra*, MLA will be given the opportunity to be heard prior to a sale during the course of the Bankruptcy proceeding, that issue is premature at this stage and is not properly before us.

Thus, all that is left for McLean to perform is the tender of money in order to exercise an Option, which it is under no obligation to exercise. Since the MLP sale has been completed, it seems unlikely that the obligations under this contract, taken as a whole, are so far unperformed by McLean so that the failure of performance on either side would constitute a material breach. This contract has been substantially performed by McLean. Where there has been substantial performance, a breach by either side is not considered material. J. Calamari and J. Perillo, *Contracts* 3d Ed. § 11–18 pp. 461–62. ("Substantial performance is the antithesis of a material breach.") The parties, however, have characterized their contract as executory and have based their arguments on the theory that the contract is an executory contract.

7. Section 365(d)(2) provides:

In a case under chapters 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2).

again." *Id.* at 532, 104 S.Ct. at 1199.[8]

MLA would apply this conclusion to the enforceability of an unassumed executory contract both by and against a debtor-in-possession. We have, however, recently examined the issue and concluded that *Bildisco* should be limited to the holding therein, *i.e.*, that an assumable but unassumed executory contract cannot be enforced *against* a debtor-in-possession post-petition, *see* H. Buschman, *Benefits and Burdens: Post–Petition Performance of Unassumed Executory Contracts*, 5 BANKR.DEV.J. 341, 359 (1988), and that a debtor-in-possession should be able to enforce assumable executory contracts. *Id.* Familiarity with that article is presumed and it will not be extensively repeated here.

Prior to *Bildisco*, it was recognized that an assumable but unassumed executory contract continues in effect and can be enforced by a debtor-in-possession. *Data Link Sys., Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.)*, 715 F.2d 375, 380 (7th Cir. 1983); 2 *Collier on Bankruptcy*, ¶ 365.03 at 365–28, 369–29. In *Whitcomb & Keller*, the debtor, a mortgage banker had entered into an assumable pre-petition executory contract with a computer service company. When its Chapter 11 petition was filed, the debtor owed a portion of the service fee. Post-petition, the debtor paid for all services in full. Because of the unpaid pre-petition fee, the service company refused to perform post-petition, asserting that in order to receive full performance under the contract, the debtor must make full-payment of the amount owed pre-petition. The Seventh Circuit held that the contract remained in effect against the computer company until formally assumed or rejected, ruled that the debtor did not have to pay the pre-petition debt in order to enforce the contract post-petition and affirmed the bankruptcy court's issuance of a restrain-

ing order preventing the computer company from terminating its services. 715 F.2d at 378.

If the reasoning of the majority in *Bildisco* were intended to apply beyond the holding that an unassumed executory contract is not enforceable *against* a debtor-in-possession and thereby preclude enforcement *by* a debtor-in-possession, one would think that the Supreme Court would have indicated its intention to overrule pre-existing authority. *See Kelly v. Robinson*, 479 U.S. 36, 47, 107 S.Ct. 353, 359–60, 93 L.Ed. 2d 216 (1986); *Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 759–60, 88 L.Ed.2d 859, *reh'g denied*, 475 U.S. 1090, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986).

After *Bildisco*, the same rule was applied in *In re Webster Clothes, Inc.*, 36 B.R. 260 (D.Md.1984). There, the debtor-in-possession, a tenant under non-residential lease, sought to exercise an option to renew its lease prior to formal assumption of the lease. The court held that the exercise of the option was effective prior to assumption and that the landlord, having failed to secure an early assumption or rejection of the lease would not be heard to complain that the debtor-in-possession had not assumed the lease when it exercised the option. *Id.* at 264.

Indeed, some courts have extended the rule to hold that an unassumable executory contract may not be terminated by a non-debtor absent relief from the automatic stay. *See Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.)*, 824 F.2d 725 (9th Cir. 1987) (non-debtor liable in damages to debtor-in-possession for terminating contract without relief from automatic stay regardless of whether contract was assumable); *In re Wegner Farms Co.*, 49 B.R. 440 (N.D.Iowa 1985) (Unassumable bonding

---

**8.** MLA also relies upon *In re Air Florida System, Inc.*, 48 B.R. 440 (S.D.Fla.1985) in support of its argument that the Debtor, cannot enforce the Agreement prior to formal assumption. The court in *Air Florida*, however, denied enforcement of a pre-petition collective bargaining agreement *against* the debtor airline. That deci-

sion was based on the *Bildisco* rationale that the executory contract was not enforceable *against* the debtor prior to formal assumption, *id.* at 443, and is factually distinguishable from the case before us where it is the *debtor* who is seeking to enforce an executory contract.

agreement held in effect pending request for relief under the automatic stay.)[9]

Another post-*Bildisco* source of authority supporting the enforceability of unassumed executory contracts is found in those cases permitting a non-debtor to recoup a pre-petition debt as a defense to a post-petition contractual obligation owed to a debtor-in-possession even though the contract had not been assumed. *See e.g. Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155 (10th Cir.1986); *California Canners & Growers v. Military Distribution of Va., Inc., (In re California Canners & Growers)*, 62 B.R. 18 (Bankr. 9th Cir.1986); *Noland v. Turner Construction Co. (In re Alpco, Inc.)*, 62 B.R. 184 (Bankr.S.D.Ohio 1986). Although we disagree with the result reached in these cases, Buschman, *supra* p. 448 at 355–58, their underlying rationale rests on the theory that an unassumed executory contract is enforceable by a debtor-in-possession prior to formal assumption or rejection and that a non-debtor may therefore recoup.[10]

Strong policy reasons explain this consistent reasoning that a debtor-in-possession should be permitted to enforce an assumable executory contract prior to formal assumption or rejection. First, § 365, in postponing the time within which a debtor-in-possession must assume or reject executory contracts to confirmation of plan, is designed to afford the debtor-in-possession with "flexibility and breathing space," *Bildisco*, 465 U.S. at 532, 104 S.Ct. at 1199, and with time for it and its creditors to intelligently assess its business prospects.

Secondly,

[a] debtor-in-possession's ability to continue to perform and to compel performance with respect to assumable executory contracts is usually the life blood of its reorganization.

Buschman, *supra* p. 448 at 346. For the courts to deprive a debtor-in-possession of that ability is inconsistent with and would sharply limit the reorganization process contemplated by Chapter 11.

Furthermore, to force a debtor-in-possession to assume an executory contract before allowing it to compel performance could be greatly prejudicial. Assumption not only requires cure, but it subjects the estate to potential administrative liability for failure of future performance, thus priming the claims of general unsecured creditors. 11 U.S.C. 365(a); 2 *Collier on Bankruptcy* § 's 365.01, 365.04.[11] Early assumption is often not in the best interests of the estate since it can force premature decisions which could later jeopardize a successful reorganization process.

As a matter of law, therefore, MLA's assertion that it is not to be compelled to honor the exercise of the Option because McLean did not assume the Agreement prior to its expiration cannot be sustained.

In this case, moreover, to sustain that position would be highly inequitable and unjust. This case is an excellent example of the need for breathing space and flexibility. The chaotic situation and crisis conditions facing management of this Debtor, because of its involvement with United States Lines and United States Lines (S.A.), in the first several months after the bankruptcy petitions were filed, amply demonstrates the reason for the policy. Examination of all of the evidence leads to the

---

9. These holdings have been criticized on the ground that a debtor-in-possession should not be able to enforce an unassumable executory contract. Buschman, *supra,* p. 448 at 348-9. Since the Agreement is conceded to be assumable, the criticism is inapplicable here and these authorities support the proposition noted in the text.

10. Recoupment is based on obligations from the same transaction. 20 Am.Jur.2d *Counterclaims, Recoupment and Set Off* § 17 (1965). Thus, if the contract does not exist post-petition until assumed as MLA argues, obligations owing to

the debtor-in-possession would not arise from the same transaction as pre-petition obligations of the debtor.

11. Because assumption creates a post-petition liability and requires cure of pre-petition and post-petition defaults, a motion to assume must be made pursuant to Rule 6006 of the Rules of Bankruptcy Procedure, on notice to parties in interest as the court may direct. Rule 6006(c). Since MLA is a party to the Agreement, it would have a stake in the issue, and is, therefore, a party in interest to such a motion and must receive notice.

conclusion that the urgency of that endeavor resulted in the confusion among Hiltzheimer, Stevens and McCown and either a lack of communication or Hiltzheimer's having forgotten that he had been informally apprised that the Option would be exercised. It hardly accords with the policy of breathing space and flexibility to require McLean to have assumed the Agreement before the Option expired, as MLA would have us hold, and thereby deprive its sorely burdened creditors of the benefit estimated by management. Particularly is that so here since MLA makes no allegation that McLean had previously breached the Agreement or that it had been prejudiced by McLean's performance under the Agreement.

V

The host of other allegations raised by MLA in seeking to avoid issuing its stock in light of McLean's exercise of the Option are plainly without merit.

Throughout MLA's objection to McLean's exercise of the Option lies the unproven accusation that the exercise of the Option and the offer by Malcom McLean to repurchase the stock constitute a form of "backroom dealing" in which Malcom McLean, as an insider of McLean, acted to the detriment of creditors. MLA Pretrial Memorandum 17. MLA suggests that the Debtor had no business reason to exercise the Option, *id.* at 18–22, and the Debtor intended the transaction to benefit Mr. McLean personally. *Id.* at 20.[12]

These allegations ignore that the letter agreement with Malcom McLean does not obligate the Debtor to sell the stock to him, that his offer to purchase the MLA stock at a profit of approximately $25,000 to the estate merely provides a floor price and that there is no evidence in this record that the Debtor intends to resell the stock to Mr. McLean. What is amply demonstrated by this record is that the exercise of the Option was in the interest of the estate. Not only does the testimony uniformly so

affirm, *e.g.* Hiltzheimer Deposition 57, but management took the further step of estimating the Option Stock to have a net value of roughly $1.7 million in the Fall of 1986 and a value over $2 million in the Spring of 1987.

Furthermore, it is not at all clear that this Debtor will sell the Option Stock. There is no indication that it, after reorganization, will lack the ability to retain that stock. While the Debtor has sold preferred stock issued by Arecibo Paper Mill, Inc. ("Arecibo"), and the stock of a wholly owned subsidiary, *see In re McLean Industries, Inc.,* 88 B.R. 36 (Bankr.S.D.N.Y. 1988), it did so only after notice and hearing. In the latter case, moreover, the Debtor had negotiated with a director and established a stalking horse or floor price. Because an objection was made, the Court, following *Ross v. Kirschenbaum (In re Beck Indus., Inc.),* 605 F.2d 624 (2d Cir. 1979), ordered that an evidentiary hearing be held. Ultimately the stock was sold to a third party at a considerably higher price. *See* 88 B.R. at 38.

Should McLean decide to sell the Option Stock, a similar hearing will be held and evidence taken if an objection is lodged. Because paragraph 5(e) of the Agreement contains McLean's representation that the Option stock will be acquired for investment and not for distribution in order to comply with S.E.C. Rule 144, MLA will be given notice and thus the opportunity to then assert any contention it may have in that respect. Those contentions at this stage are simply premature.

Completely frivolous is MLA's further assertion that McLean breached the Agreement by filing a bankruptcy petition and failing, in its view, to comply with §§ 345, 363(b)(1) and 365 in the respects addressed in parts II, III and IV of this Opinion. It grounds that assertion on paragraph 6(d) where McLean represented that it had authority to enter the Agreement, that the Agreement was duly executed and delivered and that

---

**12.** MLA does not contend that the exercise of the Option was *ultra vires. See* Del.Code.Ann. tit. 8 § 124 (1984).

[t]he sale of shares by it and the making and performance of this Agreement shall not violate or result in a breach of or constitute a default under any agreement or instrument or judgment or decree to which [McLean] is a party or subject or the Certificate of Incorporation or By–Laws of [McLean].

Exhibit I ¶ 6(d).

That paragraph is a standard clause, part of a seller's contractual representations and warranties. MLA has adduced no evidence that the parties, in agreeing to the clause in 1977, contemplated bankruptcy proceedings over nine years later.[13]

Also frivolous is MLA's assertion that Stevens, McLean's Vice President and Treasurer at the time of the transaction, lacked authority to exercise the Option and sign the check tendered for the Option Stock and thereby acted in contravention of McLean's By–Laws. MLA Pretrial Memorandum 4–5. In the first place, the sections of the By–Laws referred to by MLA, §§ 3.5—3.9, while describing the duties of each officer of McLean, do not prescribe who may or may not engage in transactions of the type at issue here. *See* Exhibit B § 3.5–§ 3.9. There is simply no evidence that Stevens, as Vice President and Treasurer, lacked authority to sign a letter exercising the Option and the check after being instructed to do so by the Chairman of the Board. Indeed, the little evidence there is in the record indicates to the contrary: the Board of Directors approved the transaction, McCowan Deposition 137, and, Hiltzheimer's anger upon being informed of the Option was not prompted by any notion that Stevens lacked authority to exercise the Option, but, rather, was provoked by the failure to receive notice of the exercise in advance. Hiltzheimer Deposition 52.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The reasons advanced by MLA for refusing to issue the Option stock on the Debtor's timely exercise of the Option are unavailing and the Debtor is entitled to specific performance.

Plaintiff's counsel is to settle an order consistent with this Decision.

---

**13.** That assertion also leads to the legally untenable conclusion that the Debtor would be barred from assuming the Agreement or exercising the Option because it has filed a petition in bankruptcy. Section 365(b)(2)(B) provides that assumption of an executory contract does not require cure of a breach of a provision relating to the commencement of a bankruptcy case, 11 U.S.C. § 365(b)(2)(B), and, as noted above, debtors-in-possession can enforce assumable but unassumed executory contracts.