**In re THOMSON McKINNON SECURITIES, INC. and Thomson McKinnon, Inc., Debtors.**

**Bankruptcy Nos. 90 B 10914, 90 B 11805.**

United States Bankruptcy Court, S.D. New York.

Oct. 16, 1990.

Debevoise & Plimpton, Morgan, Lewis & Bockius, New York City, for debtors.

Wolf Haldenstein Adler Freeman & Herz, New York City, for former employees/objectants.

Strook & Strook & Lavan, New York City, for the Official Unsecured Creditors' Committee.

## DECISION ON MOTION FOR ORDER AUTHORIZING DEBTORS TO SELL THE THOMSON McKINNON INVESTMENT MANAGEMENT BUSINESS

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

Thomson Advisory Group, Inc. ("TAG"), a corporation formed by an investment group and which includes three key employees of a publicly-held limited partnership, Thomson, McKinnon Asset Management, L.P. ("the Partnership") seeks to acquire the debtor's interest in the Partnership. The debtor, Thomson McKinnon, Inc., is the parent corporation of Thomson McKinnon Holdings, Inc., which in turn owns 100% of the shares of Thomson McKinnon Asset Management, Inc., the corporate general partner of the Partnership.

As corporate general partner of the Partnership, Thomson McKinnon Asset Management, Inc. ("TMAMI") owns 64% of the outstanding shares of the Partnership, whereas the general public owns 36% of the Partnership's remaining shares. Thus, through its two lower tier, wholly-owned corporations, the debtor indirectly owns 64% of the Partnership's equity. Neither the two wholly-owned, subsidiary corporations nor the partnership are Chapter 11 debtors. The issue to be resolved is whether the newly created investment group known as TAG, which includes the three key management employees of the nondebtor partnership may purchase the only remaining substantial asset of the debtor, namely, Thomson McKinnon Asset Management, Inc., the asset management company which owns 64% interest in the nondebtor Partnership. Manifestly, an approval of the proposed purchase agreement will result in the sale of the debtor's remaining major asset before the submission of a Chapter 11 Plan of Reorganization and before the two fundamental Chapter 11

activities involving the approval of a disclosure statement and the requirements for satisfying the standards for confirmation delineated under 11 U.S.C. § 1129.

█ The Official Unsecured Creditors' Committee ("Creditors' Committee") supports the proposed sale. The only opposition to the transaction comes from a group of ex-employees of the debtor and a related debtor, known as Thomson McKinnon Securities, Inc., who were beneficiaries of a trust fund set up for the benefit of the Debtors' employees (the "Objectants"). Although the debtor and Creditors' Committee characterize the objectants as beneficiaries of security interests under ERISA, and not general creditors, the objectants filed proofs of claim as beneficiaries under 29 U.S.C. § 1002(21)(A) and are plaintiffs in a class action pending in the United States District Court for the Southern District of New York. The Objectants maintain that the debtor violated its fiduciary responsibility to act prudently in the management of the pension plan and the disposition of the trust assets under ERISA. The Objectants claim that the debtor breached its fiduciary duties causing damages to the ex-employees in an unascertained amount. They also contend that they were induced to undertake or continue employment with the debtors and to continue to participate in the pension plan as a result of fraudulent, material misrepresentations or omissions in various pension plan statements and reports. Thus, unless and until their claims are resolved, the objectants have standing to oppose the proposed sale in accordance with 11 U.S.C. § 1109(b).

After two days of hearings, which concluded in the late evening of October 15, 1990, the court must now resolve the debtor's motion to approve the proposed sale by October 16, 1990. The one-day deadline was imposed by the parties because in order to meet the purchaser's deadline of October 30, 1990, the parties must allow time for an appeal after the entry of a final order which will also include the rejection of certain executory contracts which are the prerequisites for the approval of the proposed sale to the prospective purchaser.

### Factual Background

On March 28, 1990, Thomson McKinnon Securities, Inc. ("TMSI") filed with this court its petition for reorganizational relief under Chapter 11 of the Bankruptcy Code. On June 8, 1990, Thomson McKinnon, Inc., ("TMI"), TMSI's parent corporation also filed with this court its petition for reorganizational relief under Chapter 11 of the Bankruptcy Code. Both debtors continue to manage their properties and operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

On August 15, 1990, the debtor, TMI filed a motion for authorization to complete a management buyout of the debtor's investment management business, Thomson McKinnon Asset Management, Inc., which owns 64% of the publicly traded, nondebtor limited partnership known as Thomson McKinnon Asset Management, L.P. The price is lower than indications of interest from other potential bidders and lower than the general range of prices for the debtor's stock on the New York Stock Exchange. The proposal also includes a modification of the Employee Awards Program which affects the interest of the ex-employee Objectants. The proposed transaction is the result of nearly a year of efforts by the debtor and its investment banker. The proposed purchaser, TAG, is the only party to offer terms acceptable to the debtor and to the three key management employees who are responsible for the continuation of the Partnership's business. The employment contracts of the three key employees will expire on December 31, 1990 and January 2, 1991.

The key employees are Robert B. Prindiville, the Chief Executive Officer of the Partnership and Irwin F. Smith and Donald A. Chiboucas, the two most important investment managers of the Advisor. An investment management business, which includes the management of pension plan funds and mutual funds controlled by various trustees of the mutual funds, is service intensive, in that the investment advice and management skills of the asset managers are the primary attractions for the funds.

If the funds are not pleased with the skills and expertise of the managers they will seek such services elsewhere.

In view of the fact that the investment management business depends heavily upon personal relationships and skills, coupled with the client's confidence in the abilities of individual managers, the loss of the key investment managers would result in the loss of clients who will move their funds elsewhere.

The independent trustees of the mutual funds have indicated their intention to cancel their distribution and advisory agreements if the debtor's management business, which represents 64% of the nondebtor limited partnership, is not sold promptly to a buyer who is acceptable to key management investment employees.

### Findings of Fact

1. The debtor's investment management business consists of two aspects; an investment function and a distribution function. The investment function is performed by the nondebtor Partnership, in which the debtor's subsidiary corporation, TMAMI, owns 64% of the partnership units. The Partnership provides investment and advisory services to individual and institutional clients. The distribution function is performed by another subsidiary of the debtor known as Thomson McKinnon Fund Distributors Inc. (the "Distributor"), which is a registered broker-dealer and the principal underwriter for sales and marketing services for a number of mutual funds (the "Funds"). The Distributor and Partnership combined manage approximately $7 billion in assets.

2. There are approximately 17 mutual funds with assets that are managed by the Partnership. The Funds are grouped in various categories including investment trusts ("TMIT") and cash accumulation trusts ("CAT"), which were organized to provide customers with money market funds in which to invest cash balances in their brokerage accounts.

3. The trust funds' clients are managed by a board of trustees, including independent trustees unrelated to the debtor or its affiliates who supervise the affairs of the Funds. The trustees of the Funds may terminate the advisory agreements between the Partnership, which provide investment management services, at any time on 60 days notice.

4. When an investor redeems shares in the TMIT Funds such investor is assessed a redemption fee, which is a deferred sales charge. There is no charge if the investment is redeemed after five years. The redemption fees are payable to the Distributor.

5. Beginning in 1989, the debtor commenced the discontinuance of its activities as a broker-dealer in view of the fact that its expenses as a broker-dealer exceeded the compensation it received for distribution services. Accordingly, the debtor sold the branch offices, customer accounts and related assets to Prudential–Bache Securities, Inc. ("Pru–Bache") in September of 1989. The debtor's sales activities for the TMIT and CAT operations are through Pru–Bache brokers. As is the case of the investment management services, the TMIT and CAT distribution operations may be terminated by the independent trustees who manage these operations.

6. The debtor's investment management business is the remaining operational activity of the debtor and its subsidiaries. Although profitable, the total assets under management by the Partnership in which the debtor has a 64% interest decreased in 1989 and continues to decrease due to the uncertainty and adverse publicity caused by the debtor's financial difficulties. The only way to maximize the value of the debtor's assets is to sell them promptly.

7. A more critical reason for achieving a prompt sale of the debtor's assets is the fact that the employment contracts of the key employees of the nondebtor Partnership, Irwin F. Smith and Donald A. Chiboucas, who are the most important investment managers, and Robert A. Prindiville, the Chief Executive Officer of the debtor's asset management business, will expire by December 31, 1990 and January 2, 1991. The departure of these key employees, who

have personal relationships with individual portfolio managers who hold their management and investment skills in high esteem, would mean that many institutional and individual accounts would be lost. The key employees are responsible for developing the investment management business which involves portfolios in excess of 2½ billion dollars.

8. The trustees of the funds have indicated their intention to terminate the investment agreements if a sale of the asset management business is not made promptly to a buyer who is acceptable to the Funds. Similarly, the key employees have made it clear that any such sale must meet with their approval.

9. In a letter dated February 20, 1990, to the debtor's Chairman, Irwin F. Smith, one of the three key employees wrote as follows:

The process of having potential bidders for TMAMI jump hurdles established by TMI and its creditors, without including us from the beginning, is counterproductive. It makes reaching an agreement satisfactory to all interested parties, including ourselves, more difficult, if not impossible. In order to maximize the likelihood of a mutually acceptable agreement being reached, we must meet with potential buyers to discuss the terms on which we would enter into a new arrangement. This should be accomplished before they are required to make a tentative commitment as to price. Since the continuing relationship of Columbus Circle with TMAM L.P. is a critical element of TMAM L.P.'s value, the price of TMI's Interest cannot be realistically established until a potential buyer understands the terms on which we would be prepared to continue.

To summarize, prospective buyers of TMI's Interest in TMAM L.P. should be advised at the outset that they will have to negotiate directly with us as to the terms on which we would continue to provide asset management services to TMAM L.P. after December 31, 1990. No one is authorized to negotiate for us.

10. In July of 1989, the debtor retained Berkshire Capital Corporation ("Berkshire") to assist in selling the debtor's investment management business. Berkshire is an investment banking firm that specializes in mergers and acquisitions of firms in the investment management business. Berkshire communicated with many prospective purchasers and distributed offering memoranda to prospective purchasers.

11. Berkshire received nine preliminary expressions of interest from potential purchasers in August and September of 1989. The debtor actively followed up with three potential purchasers for purposes of providing due diligence information and arranging for meetings with the management of the debtor and the Partnership. Negotiations with the three prospective purchasers did not result in an acceptable arrangement. One of the main reasons for the lack of success was the fact that the three key employees, namely Messrs. Prindiville, Smith and Chaboucas could not agree to an acceptable deal which would result in a continuation of their employment beyond the expiration of their contracts.

12. Berkshire continued to seek prospective purchasers of the debtor's investment management business. In January of 1990, three additional prospective purchasers submitted preliminary bids. One of the three bidders was Private Capital Partners, Inc. ("PPC"), a privately held investment banking firm. The other prospective bidder was Legg Mason, Inc. ("Legg Mason"), an investment banking and brokerage firm. The key employees rejected PPC and Legg Mason because they could not negotiate a satisfactory employment arrangement with them.

13. The third prospective bidder was Greylock/TAG Group ("Greylock"). Greylock is a private equity capital firm based in Boston, Massachusetts. Greylock shares office space in New York and a FAX machine with Berkshire, although the two entities are not otherwise related. Berkshire has had previous business dealings with Greylock. The preliminary bids of PPC and Legg Mason were higher than

Greylock's bid, but the key employees did not believe that they could arrange satisfactory employment and equity arrangements with either PPC or Legg Mason. Thus, the key employees refused to go along with the prospective bids submitted by PPC or Legg Mason.

14. In March of 1990, Greylock informed the debtor that it had made an acceptable arrangement with the three key employees whereby they would each receive a 10% equity interest in a new prospective purchasing entity known as TAG which consisted of Greylock and the three key employees. This arrangement was referred to as a lock up, because the three key employees agreed that they would not accept offers from any other prospective bidders. The effectiveness of this so-called lock up will be rendered academic if this court does not approve the contract of sale to TAG.

15. The proposed purchase price offered by TAG is based upon a closing date that was originally planned for April of 1990. Pursuant to the proposed contract, TAG will purchase 200,000 general partnership units and will have an option to buy another 5,533,288 partnership units before January 10, 1994. The option exercise price is to be reduced by the amount of actual distributions that the selling entities receive from the Partnership prior to the exercise of the option. The total cash that the debtor will receive at closing will amount to

$6,433,338.00 as follows:

| | |
|---|---|
| $ 800,000 | for 200,000 units |
| 4,253,288 | for option on 5,553,288 units |
| 100 | contingent option on Partnership units |
| 100,000 | for Distributor stock and name |
| 1,280,000 | for covenant not to compete |
| $6,433,388 | Total |

The debtor may receive additional funds based on contingent factors which might bring in another $34,339,151.00, for a total

purchase price of $40,826,539.00. The contingent items are as follows:

| | |
|---|---|
| $18,149,185 | Portion of option exercise price on Principal LP Option subject to reduction by payment of cash distributions |
| 1,383,322 | Minimum option exercise price regardless of cash distributions |
| 2,766,644 | Increased option price on achievement of performance goals |
| 10,600,000 | Redemption fees from TMIT Funds |
| 1,494,000 | Redemption fees and sales charges from CAT funds |
| $34,393,151 | Total |

16. Based on the testimony of David B. Hiley, a past director and officer of the debtor, if the contract is not approved there may not be any assets left for the debtor to sell. As to the contingent portion of the proposed purchase price, of the $18,149,185.00 which is subject to reduction by the payment of cash dividends, $4,000,000.00 has already been realized and will not be contingent. Another $4,000,000.00 will also be realized for a total of $8,000,000.00. The debtor will probably not receive the $1,383,322.00 for the minimum option price. Additionally, the debtor should receive approximately $12,000,000.00 for redemption fees paid by investors who redeem their funds. Therefore, if the TAG contract is not approved, the debtor will not receive the $6,433,388.00 cash payment and approximately $14,000,000.00 out of the $34,393,151.00 of contingent funds. Hence, the difference between the $20,000,000.00 of contingent funds that the debtor would receive even if the TAG contract is not approved and the approximate maximum sum of $40,000,000.00 the debtor might receive if the TAG contract is approved is approximately $20,000,000.00. The sum consists of the cash payment of $6,433,388.00 and

contingent funds of approximately $14,-000,000.00 that the debtor would not otherwise receive.

17. After the TAG offer was submitted to the court for approval, another prospective purchaser attempted to submit a bid for the debtor's investment management business. This prospective bidder was Manulife Insurance Company of Canada ("Manulife"). Manulife considered making an offer of $33,000,000.00. The court entered an order permitting Manulife to negotiate with the three key employees without being threatened by TAG for interfering with its contractual arrangements with the three key employees. However, after discussions with the key employees during the period allowed for negotiations, Manulife determined to withdraw from the bidding process. Thus, the TAG contract is the only offer currently available to the debtor.

18. Time is of the essence because the contracts with the key employees will expire by January 2, 1991, whereas the trustees of the Funds have threatened to terminate their arrangements with the Partnership if a prospective purchaser is not promptly approved who could offer investment management services which would meet with their approval.

19. The independent trustees of the Funds will not tolerate further delays. The asset levels under the current investment managers continue to fall and the termination dates for the contracts with the key employees are a little over two months away. There are no other prospective purchasers on the horizon who could negotiate a mutually acceptable contract of purchase for the debtor's investment management business.

20. The prompt sale of the debtor's investment management business is not only in the best business interests of the debtor, but also serves the best interest of the public holders of the Partnership whose interest may be adversely affected if mutual funds and pension funds terminate their contracts with the Partnership before the debtor is able to sell its interest in the Partnership. On the other hand, the objectant ex-employees argue that the management buy out contract is too low and that the debtor should continue to seek another mutually acceptable purchaser, notwithstanding that the independent trustees of the Funds have threatened to terminate the investment management arrangements with the nondebtor partnerships and the key investment managers refuse to extend their employment contracts beyond the end of this year. The debtor and the Creditors' Committee do not wish to risk the loss of the revenues from the proposed sale in the face of the depreciation of the debtor's assets, independent trustees' threat to take their business elsewhere and the termination of the key employees' contracts with the nondebtor partnership at the end of this year.

## Discussion

█ The proposed sale of the Partnership by the debtor is clearly outside the ordinary course of the debtor's business. Therefore, the debtors' authority for the proposed sale of the Partnership is controlled by 11 U.S.C. § 363(b)(1) which provides that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate". However, as the United States Court of Appeals for the Second Circuit recognized in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir.1983), a bankruptcy judge is not given *carte blanche* authority under § 363(b) to approve a sale outside the ordinary course of business. *Id.* at 1069. Instead, "... there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)". *Id.* at 1070. This articulated business justification must be made by an express finding of the bankruptcy judge from the evidence presented at the hearing for approval of a § 363(b) sale. *Id.* at 1071.

■ The *Lionel* court further provided certain guidelines for bankruptcy judges to follow in fashioning their findings. The nonexclusive list includes:

(1) the proportionate value of the asset to the estate as a whole;

(2) the amount of elapsed time since the filing;

(3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future;

(4) the effect of the proposed disposition on future plans of reorganization;

(5) the proceeds to be obtained from the disposition compared to appraisals of the property;

(6) which of the alternatives of use, sale or lease the proposal envisions;

(7) whether the asset is increasing or decreasing; and

(8) whether appellants opposing the sale produced evidence before the bankruptcy court that such sale was not justified. *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)* at 1071.

■ In reviewing the guidelines articulated by the *Lionel* court, this court finds the following factors to be decisive:

(1) The debtor's interest in the nondebtor Partnership constitutes the remaining major asset of the estate.

(2) The first Chapter 11 petition was filed by TMSI nearly six months ago. TMI filed its Chapter 11 petition over four months ago.

(3) There is no evidence that a plan of reorganization will be proposed and confirmed in the near future. The only distribution to creditors will result from the liquidation of the debtor's assets, which are steadily declining in value.

(4) Whether or not the proposed sale is approved, there will be no reorganization of the debtor.

(5) The proceeds to be obtained from the disposition of the proposed sale will not implicate any appraisals of assets because there are no tangible assets involved. The debtor's main asset consists of an interest in an investment management business which relies upon the skill and personal relationships developed by the key employees who hold an equity interest in the prospective purchaser and who are not employees of the debtor.

(6) The only method for maximizing the assets of this estate is the sale of the debtor's interest in the nondebtor Partnership.

(7) The debtor's interest in the Partnership is decreasing steadily and must be disposed of before the contracts of the key employees of the nondebtor Partnership terminate by December 31, 1990 and January 2, 1991.

(8) The Objectants concede that a prompt sale is essential, although they believe that a higher price should be obtained from sources unknown, despite the depreciating business prospects and the approaching termination of the contracts with the key employees of the Partnerships. The fact that the prospective purchaser has agreed to provide equity interests to the key employees who have rejected other potential bidders does not detract from the fact that the key employees may not be compelled to approve and work for a potential bidder acceptable to the debtor, especially since the trustees of the managed portfolios are free to select investment advisors of their own choice and may follow the key employees after they move to other investment advisory firms next year.

In sum, the debtor has exercised its best business judgment in agreeing to sell its investment management interest in the Partnership to TAG in accordance with the terms of the proposed contract. The Creditors' Committee supports the sale as does the attorney for some of the publicly held limited partnership interests. The objecting employees have not offered an alternative arrangement and simply hope for a better deal. However, there is no other prospective purchaser in sight and those urging the acceptance of the proposed con-

tract of sale are unwilling to risk the loss of the investment management services which comprise the debtor's only remaining substantial asset.

### Conclusions of Law

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(N).

2. The contract proposed by the debtor for the sale of its investment management business which is represented by a 64% interest in the nondebtor limited partnership, Thomson McKinnon Asset Management, L.P. is in the best interests of the debtor and is supported by the Creditors' Committee and publicly held limited partnership interest.

3. The proposed contract of sale submitted by the debtor is approved.

IT IS SO ORDERED.