**In re GENERAL BEARING CORPORA-TION, Hyatt Railway Products Corp., Fisco Industries, Ltd., Debtors.**

**Bankruptcy Nos. 91 B 21424, 91 B 21425 and 91 B 21426.**

United States Bankruptcy Court, S.D. New York.

Feb. 3, 1992.

Kurtzman & Haspel, Spring Valley, N.Y., for debtors.

Pillsbury Madison & Sutro, Kenneth N. Russak, Los Angeles, Cal., Lee A. Pollock, White Plains, N.Y., for Wells Fargo Bank Nat. Ass'n.

McCarter & English, Newark, N.J., for World Machinery Co., Inc.

Gordon, Gordon & Tepper, P.C., New York City, for Atlantica Establishment.

Hahn & Hessen, New York City, for Bank of New York.

## DECISION ON MOTION FOR ORDER APPROVING SALE OF ASSETS AND MOTION FOR AN ORDER EXTENDING EXCLUSIVITY PERIOD

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

The Chapter 11 debtor, General Bearing Corporation, has moved pursuant to 11 U.S.C. § 363(b) and (f) to sell free of liens certain of its assets to World Machinery Co., Inc. ("World"), a corporation formed by insiders of the debtor. The debtor has also moved pursuant to § 1121(d) to extend its exclusive right to file a plan of reorganization, as authorized under 11 U.S.C. § 1121(b), until March 31, 1992. The March 31, 1992 date is significant because that is the termination date of the court-approved financing order which authorized the debtor to borrow funds with priority over administration expenses and secured liens on property of the estate.

The Bank of New York ("BNY"), which holds a first priority secured position, consents to the debtor's proposed sale of assets and does not oppose the debtor's motion for an extension of time to file a plan of reorganization. Wells Fargo Bank ("Wells Fargo"), the holder of an undersecured second priority position and a deficiency claim for the unsecured portion of its claim, objects to the proposed sale and the request for an extension of the debtor's plan exclusivity period. Atlantica Establishment, the holder of the second largest unsecured claim against the debtor, in the sum of $779,634.12, joins Wells Fargo in opposing the debtor's motions.

### FINDINGS OF FACT

1. On September 16, 1991, the debtor and its affiliated corporations, Hyatt Railway Products Corp. and Fisco Industries, Ltd., filed with this court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and have continued in management of their property as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108. An order dated September 16, 1991 procedurally consolidated the cases for joint administration.

2. The debtor is engaged in the business of manufacturing, importing and distributing antifriction bearings and industrial produce components to manufacturing industries, railroad companies and the replacement market in the United States and Canada.

3. Two individuals and one trust own 100 percent of the debtor's issued common stock. The trust was created by Seymour Gussack, the founder and Chairman of the Board of Directors of the debtor. The beneficiaries of the trust are members of Seymour Gussack's family. Harold Geneen, the Chairman Emeritus of ITT, and a friend of Seymour Gussack, owns 18.75 percent of the debtor's common stock. Robert Duncan, a former president of the debtor, owns the balance.

4. The proposed insider purchaser of the debtor's assets, World, is a recently formed corporation. Its principal shareholders are Seymour Gussack, his family, and Harold Geneen.

5. The debtor proposes to sell to World its ownership interest in various joint ventures with potential suppliers in China. The debtor also seeks to sell to World its 50 percent stock interest in a Panamanian corporation named Alurop, which owns a 100 percent interest in an East German corporation, named WMW Machinery, Inc. ("WMW"). The other 50 percent interest in Alurop is owned by an East German governmental agency known as Wemex. Also included in the intended sale are certain foreign contracts.

6. The debtor's witnesses testified that the Chinese joint ventures are of no current value to the debtor for the following reasons: (a) The Chinese joint ventures were supposed to afford the debtor a low cost supply of quality products. However, such products are readily obtainable in the market without the need for participating in a joint venture with entities in China. (b) The quality of the products supplied is not satisfactory, requiring costly remedial work. (c) The Chinese operations require additional capital investments to operate which are not available to the debtor in its present financial posture. (d) The debtor has defaulted in its performance under the Chinese joint venture agreements and is unable to fulfill its obligations to its partners in China or to furnish a letter of credit required for the funding of purchases from China.

7. The debtor's witnesses also testified that the debtor's 50 percent stock interest in Alurop does not give the debtor an unfettered control over WMW, the wholly-owned East German subsidiary. WMC has never paid a dividend to Alurop and Alurop has never paid a dividend to the debtor. The debtor's witnesses testified that its 50 percent interest in Alurop is of small value for the following reasons: (a) WMW, the East German subsidiary, owes $10 million dollars to its East German supplier of machinery, Wemex. Additionally, WMW's operations lost $789,000.00 during 1991. (b) To make WMW profitable, it would require substantial additional capital for the purchase of equipment. (c) There is an uncertain economic climate in East Germany due to German reunification. (d) Any potential profits that WMW may earn are not available to the debtor because the debtor's interest in the East German operations is reflected on the debtor's balance sheet as a 50 percent stock interest in Alurop. There is no ready market for a 50 percent stock interest in a corporation in which the other 50 percent is owned by an East German governmental agency.

8. In light of the foregoing facts, the debtor's witnesses concluded that it was their best business judgment that the debtor should sell its interests in the Chinese joint ventures and the Alurop stock, together with the related foreign contracts and that the purchase price was fair and reasonable.

9. The proposed purchase price is $800,000.00, plus a guaranteed minimum of $600,000.00 in royalties based on future operating results, for a total purchase price of $1,400,000.00. This figure is not a negotiated figure. Seymour Gussack testified that this was the amount of money he believed that he and Harold Geneen could raise for World's proposed purchase of the assets in question.

10. The debtor attempted to market all of its assets in May of 1990 when it retained the firm of Donaldson, Lufkin and Jenerett ("DLJ"). Benoit Jamar, a restructuring expert with DLJ, analyzed the debtor's operations and concluded that the Chi-

nese joint ventures and the debtor's interest in the East German operations of WMW, through its 50 percent interest in Alurop, were of small value and did not constitute value to the debtor's operations. Benoit Jamar made a presentation to approximately 180 people in the ball bearing business, of which 113 wanted a description of the debtor's operations, 30 people expressed further interest and 5 people conducted due diligence investigations. No specific offers were made although one company submitted a letter of intent which contemplated a purchase of all of the debtor's assets if certain restructuring of the debtor's debts could be worked out. No specific offers were received for the debtor's Chinese joint ventures or its interest in the East German operations. Indeed, the debtor never marketed these interests separately from its entire asset base.

11. The debtor is currently selling off unnecessary assets at a loss and is downsizing its operations to reduce expenses. It has reduced its work force from approximately 340 employees to approximately 140 employees.

12. The debtor's current operations are profitable, but because of its downsizing efforts and its liquidation of unnecessary equipment at a loss, the combined financial picture reflects a consolidated net loss of $1,703,000.00 for the period from September 1, 1991 to December 28, 1991.

13. BNY is the holder of a first priority secured claim against the debtor in the amount of $10,270,716.00 as scheduled. Wells Fargo is the holder of an allowed partially secured claim in the amount of $14,374,969.00, of which approximately $11,000,000.00 is scheduled as unsecured. Wells Fargo's liens are of first priority on machinery, equipment, furnishings and fixtures and of second priority, behind BNY, on all other property of the debtor.

14. In light of the allowed secured claims of BNY and Wells Fargo, it follows that the debtor has no equity interest in its property.

15. The debtor contends that the proposed sale is in its best business interests because the $800,000.00 cash from the sale will be paid to BNY to reduce its secured claim and also reduce the interest charges by approximately $7,500.00 per month. The sale will leave the core business of the debtor intact.

16. BNY holds the personal guaranty of Seymour Gussack to the extent of $200,000.00.

17. World has indicated that the sale must be finalized by mid-February because now is the time to attempt to revive the operations in China and East Germany. The debtor believes that the transaction with World represents the best opportunity to maximize the value of the assets in question and that if World's offer is not accepted by mid-February, the opportunity to sell these assets will be lost.

18. Wells Fargo objects to the sale to an insider of the debtor because it believes the price to be unreasonably low. Moreover, there was no proof that the debtor attempted to market the Chinese joint ventures or its Alurop stock separately from its attempt to market its entire business. Wells Fargo's witness from the accounting firm of Price, Waterhouse & Co. testified that World was proposing to purchase the debtor's interest in the Chinese joint ventures and the East German operation at a bargain price because the debtor's book value for these interests is substantially higher.

## DISCUSSION

The proposed offer from World, the corporation formed by the debtor's insiders, reflects an indirect end run around the bankruptcy concepts of absolute priority and new value. If this were a confirmation issue, the debtor could not confirm a plan over Wells Fargo's objection if Wells Fargo did not retain its lien on all the debtor's property, as expressed in 11 U.S.C. § 1129(b)(2)(A)(i)(I), whether the property was retained by the debtor or transferred to another entity.[1] In the instant case, the

---

1. Section 1129 states

that the holders of such claims retain the liens securing such claims, whether the property

debtor proposes to transfer the assets in question to World free and clear of liens. More importantly, as the holder of an undersecured claim, Wells Fargo is entitled to receive, in accordance with 11 U.S.C. § 1129(b)(2)(A)(i)(II), the allowed amount of its secured claim of a value as of the effective date of the plan, of at least the value of its interest in the collateral.[2] In other words, before the debtor's equity shareholders may retain their equity interests, objecting secured claimholders must be paid the allowed amount of their secured claims. Wells Fargo holds an allowed secured claim of over $3 million and an undersecured deficiency claim of over $11 million. Thus, although the debtor has no equity in its assets, it proposes to sell assets to a corporation formed by insiders which will then obtain an equity interest in the debtor's assets in question in exchange for an immediate cash payment of $800,000.00, which the debtor will then pay to BNY in reduction of BNY's first priority secured claim. Wells Fargo will receive no portion of the proceeds of sale in reduction of its allowed secured claim, whereas shareholders of the debtor will acquire the debtor's interest in the Chinese joint venture operations and the East German business, notwithstanding Wells Fargo's objection.

The proposed preconfirmation sale avoids a direct confrontation with the disputed issue as to whether or not new value is an exception to the absolute priority rule. *See Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 948 F.2d 134 (5th Cir.1991). The shareholder interests propose a cash payment of $800,000.00, with an opportunity for the debtor to earn additional royalties based on sales, in exchange for their obtaining for their new corporation, World, an equity interest in the assets in question. The proposal guarantees a $600,000.00 minimum royalty. The analogy to the new value problem is not complete because the offering shareholders would not retain their equity interest in the debtor in exchange for the $800,000.00 cash payment. They would only obtain an indirect interest in the specific assets in question as a result of their equity interest in the newly formed corporate purchaser, World.

■ The present case does not concern a confirmation problem. This issue must be decided in the context of 11 U.S.C. § 363(b) and (f) which authorizes preconfirmation sales of a debtor's assets under certain conditions. In considering the standards for selling a debtor's assets outside the ordinary course of business pursuant to 11 U.S.C. § 363(b), the court considers the salient factors applicable to the transaction. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). Although the assets to be sold are of no present value to the debtor and may be decreasing in value, there is no proof that the offer reflects the highest and best price for the interests sold or that the debtor ever attempted to market them separately. The proposed sale price was not arrived at as a result of arm's length negotiations but was established by insiders as the most money that they could raise. In the long run, the new corporation formed by the debtor's insiders could utilize the purchased assets to compete with the debtor's business after the termination of a proposed three year noncompetition agreement. There is also a question as to whether all of the debtor's creditors were property notified. The advertisement for the proposed sale, which was established on short notice to the creditors, was published once in the New York Times, about one week before the return date of the debtor's motion.

---

subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims.
11 U.S.C. § 1129(b)(2)(A)(i)(I).

**2.** Section 1129 states
that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.
11 U.S.C. § 1129(b)(2)(A)(i)(II).

The debtor reasons that a sale to the debtor's insiders is not fatal to a motion under 11 U.S.C. § 363(b), and cites this court's decision in *In re Thomson McKinnon Securities, Inc.*, 120 B.R. 301 (Bankr. S.D.N.Y.1990). In the *Thomson McKinnon* case this court approved a sale of assets to an entity in which key employees of the debtor held an equity interest and where there was a "drop dead" date by which the sale had to be consummated. However, the *Thomson McKinnon* case is distinguishable because the sale was made pursuant to section 363(b), not (f). Moreover, *Thomson McKinnon* involved a liquidating Chapter 11 debtor where there would be no plan of reorganization and where the asset sold was the debtor's last substantial business asset. Additionally, the key employees' contracts expired shortly after the sale. Therefore, the debtor had no opportunity to avail itself of their future services, which formed the substance of the stock advisory business which was sold.

■ While the debtor's motion seeks authorization to conduct the proposed sale pursuant to both section 363(b) and section 363(f), a sale may only be authorized under either subsection (b) or (f), but not both. Because BNY and Wells Fargo have liens on the property the debtor seeks to sell, section 363(f) is applicable, not section 363(b). Any other reading of the two sections would render section 363(f) meaningless.

■ Even if this court applied section 363(b), which it rules inapplicable, the debtor has not proved that there is a good business reason for the debtor, as distinguished from the purchasing insiders, to transfer the interests in question to world in exchange for an immediate cash payment of $800,000.00, which will then be applied to reduce BNY's first priority secured claim. The funds will not be applied towards the debtor's business operations nor was there any proof that the funds will enable the debtor to propose an effective plan of reorganization.

■ As noted above, however, there is the more fundamental reason why the court may not approve the proposed sale free and clear of liens, although surprisingly, the parties have not addressed this issue. There is no question that the debtor has no equity in its property and that the secured claimants hold liens in excess of the value of the debtor's assets. Thus, the aggregate value of all liens on the debtor's property exceed the price at which the property in question is to be sold. The express language in 11 U.S.C. § 363(f) bars this sale. Section 363(f) states:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute;  or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

In the instant case, the debtor is precluded by 11 U.S.C. § 363(f)(3) from selling the interests in question for $800,000.00 in cash and an additional $600,000.00 in future royalties at a minimum when such sale price is not greater than the aggregate value of all liens on the property to be sold. *In re K.C. Machine & Tool Co.*, 816 F.2d 238, 240–41 (6th Cir.1987); *In re Stroud Wholesale, Inc.*, 47 B.R. 999, 1001 (E.D.N.C.1985) ("Congress sought to clarify the meaning of (f)3 by amending it in 1984. Congress replaced 'such interest' at the end of the sentence with 'all liens on such property.'" (citing Bankruptcy Amendments & Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, 372 (10 July 1984))); *In re Oneida Lake Development, Inc.*, 114 B.R. 352, 356 (Bankr.N.D.N.Y.1990); *In re Beker Industries Corp.*, 63 B.R. 474, 475

(Bankr.S.D.N.Y.1986); *In re Circus Time, Inc.*, 5 B.R. 1 (Bankr.D.Me.1979).

The debtor has produced no evidence that the sale price is greater than the aggregate value of all liens on the property to be sold. Indeed, the debtor has not established the aggregate value of all liens on the property to be sold. A proposed sale free and clear of liens was denied in *K.C. Machine & Tool*, where the selling price was $640,000.00 and the total liens against the property were $1,100,000.00, despite the fact that the $640,000.00 purchase offer was the best offer available. *K.C. Machine & Tool*, 816 F.2d at 240.

■ Apart from 11 U.S.C. § 363(f)(3), the other subdivisions in § 363(f) do not support the proposed sale. The debtor has not established that Wells Fargo's secured interest can be obviated under applicable nonbankruptcy law in accordance with 11 U.S.C. § 363(f)(1). Wells Fargo did not consent, as required by 11 U.S.C. § 363(f)(2) and Wells Fargo's interest is not in bona fide dispute, as reflected in 11 U.S.C. § 363(f)(4). Finally, Wells Fargo could not be compelled in a legal or equitable proceeding, to accept less than full money satisfaction of its interest after the proposed sale was consummated as provided in 11 U.S.C. § 363(f)(5). *Stroud Wholesale*, 47 B.R. at 1002–03.

### Plan Exclusivity

■ The debtor's 120–day exclusivity period for filing a plan of reorganization as expressed in 11 U.S.C. § 1121(b), may be extended by the court for cause, after notice and a hearing, pursuant to 11 U.S.C. § 1121(d). The debtor has the burden of proving that cause exists for the requested extension. *In re Texaco*, 76 B.R. 322 (Bankr.S.D.N.Y.1987). The fact that this is the debtor's first extension request does not of itself constitute cause. This is not a complex case; there are only two secured claimholders. Financial information as to the debtor's operations is readily available. Negotiations between the debtor and its two secured creditors, BNY and Wells Fargo, have been ongoing before and since the commencement of this case. In consider-

ing a motion to extend exclusivity, the court must be mindful that the debtor should not be permitted to use the extension as a way to pressure the secured claimants to accede to the debtor's proposals. *See In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr.E.D.Pa.1986). This case has not produced numerous and complex proceedings involving related cases. *See In re McLean Industries, Inc.*, 87 B.R. 830, 834 (Bankr.S.D.N.Y.1987). As stated in *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 372 (5th Cir.1987), *aff'd*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988):

> Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.

In the instant case, the debtor lacks equity in the estate and has not been able to negotiate any restructuring acceptable to Wells Fargo. Unless Wells Fargo is willing to accept something less than its allowed secured claim, the debtor's shareholders will be bound by the modified absolute priority rule reflected in 1129(b)(2)(A)(i)(II) and will not be allowed to retain any equity interest for confirmation purposes. Therefore, the debtor is dealing with assets belonging to the creditors in which it presently has no equity interest. In these circumstances, the secured claimants should not continue as hostages in this Chapter 11 case. The debtor has not demonstrated that it has any financial ability to propose a confirmable Chapter 11 plan or that any further delay will enhance its prospects. Therefore, the playing field should be leveled so that all the players, including the debtor, will now have an even chance in proposing a reorganization plan which might be acceptable to the creditors in this case. Accordingly, the debtor's motion to extend the plan exclusivity period is denied because the debtor has not satisfied its burden of establishing that cause exists for the requested extension.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28

U.S.C. § 1334 and 28 U.S.C. § 157(a) This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (N).

2. The debtor's motion to sell its interests in the Chinese joint ventures and the East German operations free and clear of liens is denied because the price at which such interests are to be sold is not greater than the aggregate value of all liens on such property, as required by 11 U.S.C. § 363(f)(3).

3. The debtor has not established any other factor under 11 U.S.C. § 363(f) which authorizes the debtor's sale of the assets in question free of all liens to World, a corporation formed by insiders.

4. The debtor has not satisfied its burden of proving that cause exists within the meaning of 11 U.S.C. § 1121(d) to extend the 120-day plan exclusivity period authorized under 11 U.S.C. § 1121(b).

5. The debtor's motion pursuant to 11 U.S.C. § 1121(d) to extend the 120-day plan exclusivity period is denied.

SETTLE ORDER on notice.