**In re Leonard CAVALIERI, Debtor.**

**Bankruptcy No. 91–12643S.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 15, 1992.

---

James J. Moran, District Council 33, Legal Service Plan, Philadelphia, Pa., for debtor.

Leo Doyle, Upper Darby, Pa., for CoreStates Bank, N.A.

Michael D. Sayles, Philadelphia, Pa., for Anthony D'Angelo.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before this court is an unusual set of factual circumstances involving a post-petition sale of a motor vehicle by LEONARD CAVALIERI ("the Debtor"), purportedly free and clear of liens, which was made possible by the inadvertent, post-petition satisfaction of its security interest in the vehicle by the secured party. Two issues arise: (1) whether the transfer of the vehicle should be set aside, because of the Debtor's failure to provide notice required by 11 U.S.C. § 363(b) and Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 2002(a)(2); and (2) whether the lien on the vehicle should be reinstated.

This court finds that the transfer of the vehicle must be set aside, because damage inflicted upon the Debtor's estate by the unauthorized transfer can be remedied only by the return of the vehicle to the estate. Secondly, we conclude that the lien was irrevocably eliminated under applicable state law, that the doctrine of unjust enrichment is inapplicable, and therefore that we cannot reinstate it pursuant to this court's general equitable powers.

### B. PROCEDURAL AND FACTUAL HISTORY

On May 13, 1991, the Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code. A Plan of Reorganization was confirmed in this case on January 14, 1992.

In his Chapter 13 Statement, the Debtor listed a 1988 Mercedes Benz 190E, Vehicle Identification Number WDBDA29D1JF493717 ("the Mercedes"), as an item of his personal property, with a market value of $17,000.00. Also listed was a debt secured by the Mercedes which the Debtor owed in the amount of $16,-000.00 to CoreStates Bank, as successor to First Pennsylvania Bank, N.A. ("CoreStates"). The Debtor therefore claimed only his $1,000.00 equity in the Mercedes as an exemption, pursuant to 11 U.S.C. § 522(d)(2).

On July 17, 1991, CoreStates filed a proof of claim, evidencing a security interest in the Mercedes in the amount of $18,-237.75, including interest. On December 17, 1991, this court entered an Order approving a Stipulation between the Debtor and CoreStates, whereby the proof of claim amount was amended to $18,239.75. In addition, pre-petition arrearages were fixed

at $646.39. Also, pursuant to the Stipulation, it was agreed that post-petition monthly payments would be paid by the Debtor to CoreStates outside of the Debtor's Chapter 13 Plan.

In order to facilitate the filing of the amended proof of claim, CoreStates removed the contract evidencing the sale of the Mercedes ("the Contract") and the Pennsylvania Certificate of Title of the Mercedes ("the Title") from its vault. Through the inadvertence of an unidentified employee, the Title and the Contract were sent to the CoreStates unit which releases encumbrances and returns satisfied contracts. As a result, by inadvertence, the Contract was marked "paid," the encumbrance was released, and the Contract and the Title were mailed to the Debtor.

Discovering its error, CoreStates attempted to salvage the situation by requesting that the Debtor enter into a stipulation to allow relief from the automatic stay in order to reinstate the encumbrance on the Title. CoreStates has alleged that the Debtor refused such a request. This was apparently because, on December 19, 1991, one week after receiving the Contract and Title and apparently prior to the attempts of CoreStates at a negotiated settlement, the Debtor, without informing CoreStates, transferred the Title to Anthony L. D'Angelo, Sr. ("D'Angelo"), an individual who has been a friend of the Debtor for over ten years and was a former partner in a business enterprise named Footprints, Inc., currently a debtor in a Chapter 7 case in this court, at Bankr. No. 91–16235F ("Footprints"). This transfer occurred without the filing of a motion in this court, and without notice to the Chapter 13 Standing Trustee, Edward Sparkman, Esquire ("the Trustee"), or to any other creditor or interested party.

In consideration for the transfer of the Mercedes, D'Angelo paid the Debtor, in cash, $6,500.00. In a "separate" transaction, the Debtor "bought" two vehicles from D'Angelo: a Maxima, for $2,500.00; and a 1987 Ford truck, for $3,500.00 ("the Vehicles"). Although the Debtor, the sole witness at the hearing on the Motions on April 28, 1992, initially stated that the sale of the Mercedes and his subsequent purchase of the Vehicles were separate transactions, he admitted, upon further questioning, that the transactions took this form because the titles for the Vehicles were encumbered at the time of the transfer of the Mercedes and therefore their transfer was delayed.

Shortly thereafter, on February 3, 1992, CoreStates filed a Motion to Reinstate First Lien in Favor of First Pennsylvania N.A. on 1988 Mercedes Benz V.I.D. No. WDBDA29D1JF493717 ("Motion I"), wherein CoreStates requested this court, pursuant to 11 U.S.C. §§ 105, 521, and 1303, to enter an Order directing the Debtor to "return the Contract and Title to [CoreStates] and execute or have executed the necessary documentation to reinstate the lien in favor of [CoreStates] on the [Title]."

A hearing on Motion I was scheduled on February 27, 1992. On the date of the hearing, the Debtor appeared without his counsel and dumbfounded CoreStates' counsel by advising him, for the first time, of his transfer of the Mercedes. CoreStates then requested that the hearing on Motion I be rescheduled on March 19, 1992.

On March 11, 1992, the Debtor filed an Answer to Motion I, alleging that his refusal to sign a stipulation to allow relief from the stay for reinstatement of CoreStates' lien was premised on his belief that the underlying loan had been satisfied by another party. The Debtor did not allege the identity of the alleged beneficent party.

On March 19, 1992, CoreStates filed an Amended Motion to Reinstate Lien ("Motion II"), and continued the hearing on Motion I until April 28, 1992, the date that a hearing was scheduled on Motion II. Though nearly identical to Motion I and requesting approximately the same relief, Motion II added factual averments regarding the Debtor's sale of the Mercedes.

At the hearing on April 28, 1992, the Debtor's Chapter 13 Statement was admitted into evidence. Also admitted were three pages of a publication which, though nearly illegible, appear to recite "book values" for the Mercedes as of July, 1991,

December, 1991, and March, 1992, as follows:

|  |  |  |  |
|---|---|---|---|
| (1) July, 1991: | average trade-in | $17,650.00 |  |
|  | average retail | 20,475.00 |  |
| (2) December, 1991 | average trade-in | 16,575.00 |  |
|  | average retail | 19,450.00 |  |
| (3) March, 1992 | average trade-in | 15,650.00 |  |
|  | average retail | 18,360.00 |  |

---

D'Angelo entered two exhibits into evidence. The first was a pamphlet from the Manheim Auto Auction which listed the auction prices for various automobile auctions of "exotic" vehicles held on January 9, 1992. For vehicles of the model and year of the Mercedes, four auction prices were listed: $9,800.00, $12,100.00, $12,900.00, and $15,100.00. The second was comprised of three documents supplied by Janet Earnhart, who indicated that she had been previously associated with Automotive System, Inc., apparently a vehicle-leasing business which had sold the Mercedes to the Debtor. In a statement dated April 27, 1992, Earnhart stated that the Mercedes had been involved in two accidents, the dates of which were not disclosed, which resulted in damage to the front grille and severe damage to its rear requiring "extensive body work [which] was, in my opinion, very poor. ... with immediate chipping and peeling [which] affected the price adversely." However, the "price" at which the Debtor bought the Mercedes was not disclosed. Presumably, it exceeded the amount in excess of $16,000 borrowed by the Debtor from CoreStates to buy the Mercedes. Attached to Earnhart's statement was a receipt of December 3, 1990, for front grille work in the amount of $596.39; and an estimate, dated July 22, 1991, for installation of an AM/FM radio stereo and CD player ("the Radio") in the Mercedes for $2,767.51. The Radio estimate indicated that these items were needed when the Mercedes was sold to the Debtor. The testimony of the Debtor suggested that the body work occurred after the sale to the Debtor.

The sole witness at the hearing was the Debtor. The Debtor stated he purchased the Mercedes in 1989. As to the rear-end damage to the Mercedes, the Debtor stated that the entire rear section was "smashed" in an accident which occurred on or about December, 1990. Despite receiving an estimate from Mercedes Benz, the Debtor opted to have a "person downtown" service the Mercedes for $5,500.00, a repair price cheaper than that offered by Mercedes Benz. Three to four months after the repair, the Debtor testified that the paint began to "chip and peel," which necessitated a full body paint job. The Debtor stated that he had received an estimate of $6,000.00 for corrective work, although it is unclear whether this figure represented the price of a full body paint job.

The Debtor claimed that, prior to the transfer of the Mercedes to him, a passenger window had been broken in the course of the theft of the Radio. Although the window had been repaired by the Debtor, the Radio had not been replaced.

When asked why he transferred the Mercedes after the admittedly unexpected receipt of the Title and Contract, the Debtor stated that, in the course of operation of Footprints, he had come to know wealthy persons who were aware of his situation, *i.e.*, that he was "personally bankrupt" and had lost much of his property. The implication from this testimony is that he believed that his receipt of the Title and the Contract was attributable to the satisfaction of his obligation to CoreStates by one of these persons. On cross-examination by

CoreStates' counsel, the Debtor admitted to listing the fair market value of the Mercedes at $17,000.00 in his Chapter 13 Statement, despite the prior occurrence of the conditions which he claimed had lowered the value of the Mercedes.

Following the close of testimony, CoreStates argued that, pursuant to 11 U.S.C. §§ 1303, 363(b), the Debtor was imbued with the powers of a trustee, among them being the ability to use, sell, or lease property of the debtor estate. However, pursuant to § 363(b), the Debtor was required to provide notice and an opportunity for a hearing to interested parties *before* selling the Mercedes. Since the Debtor failed to provide such notice, CoreStates argued that the transfer of the Mercedes to D'Angelo should be set aside. Regarding its inadvertent satisfaction of the Debtor's obligation, CoreStates argued that the court should exercise its powers under 11 U.S.C. § 105(a) to reinstate its lien.

On April 29, 1992, this court entered an Order whereby D'Angelo was permitted, and the Trustee was requested, to make post-hearing submissions by May 8, 1992. Replies to these submissions by other interested parties were to be filed by May 15, 1992. However, no submissions were received until May 14, 1992, when CoreStates alone filed a three-page Brief. After several delays, the Trustee rendered a submission on June 12, 1992.

In its submission, CoreStates argued that D'Angelo should be required to re-transfer title to the Mercedes to the Debtor pursuant to not only 11 U.S.C. §§ 1303, 363, but also 11 U.S.C. § 549(a). As to the restoration of its security interest, CoreStates again invoked § 105(a) and contended that such relief was necessary to prevent "unjust enrichment to [the Debtor] and/or his general creditors ... [and to avoid] an abuse of the bankruptcy process." In his submission, the Trustee argued that he alone could invoke § 549(a). However, the Trustee did not purport to invoke § 549(a) himself or explain why he had not sought to do so.

## C. DISCUSSION

1. SINCE THE DEBTOR FAILED TO COMPLY WITH 11 U.S.C. § 363(b) AND F.R.B.P. 2002(a)(2) IN THE SALE OF THE MERCEDES, ITS TRANSFER TO D'ANGELO MUST BE AVOIDED.

Pursuant to 11 U.S.C. § 1303, the Debtor was vested with the rights and powers of the Trustee under 11 U.S.C. §§ 363(b), (d), (e), (f), and (*1*). Therefore, the Debtor's transfer of the Mercedes was subject to the requirements of 11 U.S.C. § 363(b)(1), which provides as follows:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

*See In re Heldor*, 131 B.R. 578, 584 (Bankr. D.N.J.1991); *In re CLC Corp.*, 110 B.R. 335, 338 (Bankr.M.D.Tenn.1990); *In re McLean Industries, Inc.*, 96 B.R. 440, 444 (Bankr.S.D.N.Y.1989); *In re Snyder*, 74 B.R. 872, 874–75 (Bankr.E.D.Pa.1987); *In re Fernwood Markets*, 73 B.R. 616, 619 (Bankr.E.D.Pa.1987); and *In re Waterfront Cos.*, 56 B.R. 31, 34 (Bankr.D.Minn. 1985). The

> term "notice and hearing" is defined by Bankruptcy Code § 102(1) to require notice as is appropriate and an opportunity to be heard; if no objections are filed, no court order permitting the sale, use or lease of property is required (citation omitted).

*McLean*, 96 B.R. at 444. *See also In re Karpe*, 84 B.R. 926, 930 (Bankr.M.D.Pa. 1988).

By the express language of F.R.B.P. § 2002(a)(2), the "parties in interest" for the purposes of § 363(b) include "all creditors." *See United States v. Goodstein*, 883 F.2d 1362, 1366 (7th Cir.1989), *cert. denied* 494 U.S. 1007, 110 S.Ct. 1305, 108 L.Ed.2d 481 (1990) (before approving a § 363(b) transaction, "notice must be provided to 'all creditors' at least 20 days in advance"); *In re Globe Investment & Loan Co.*, 867 F.2d 556, 560 (9th Cir.1989), ("the [§ 363(b)] notice requirements are contained in Bankruptcy Rule 2002(a)(2) which provides, in part, that all creditors

receive not less than 20 days notice of a proposed use, sale, or lease of property other than in the ordinary course of business"); *McLean, supra,* 96 B.R. at 444 (creditors are required to have notice of a § 363(b) transaction, since they have an interest in whether the property of a debtor estate is sold, used, or leased); *Waterfront Cos., supra,* 56 B.R. at 34 (twenty days notice is required to be given to all creditors); and *In re First Int'l Services Corp.,* 25 B.R. 66, 70 (Bankr.D.Conn.1982) ("the requirements of section 363(b) protect the creditors' interest in the asset of the estate").

As is noted in *In re Sapolin Paints, Inc.,* 11 B.R. 930, 936 (Bankr.E.D.N.Y. 1981),

> [t]he purpose of these elaborate provisions [§§ 102, 363(b), and F.R.B.P. 2002] is self-evident: It is to give the creditors who have a vital interest in the maximum realization from the assets of the estate, an opportunity to review the terms of any proposed sale, and to object thereto, if they deem the terms and conditions not to be in their best interests. A single creditor ... has sufficient interest to have an order authorizing a sale reviewed, and if appropriate, reversed.

The cases cited *supra* make no significant demarcation between secured and unsecured creditors. Such a differentiation, if made, would defeat the policy dictates of the Bankruptcy Code, which insure, or attempt to insure, equitable treatment of all creditors, without regard to whether a particular creditor, or creditors, has favorable prospects for recovering any monies from the bankruptcy process. *Goodstein, supra,* 883 F.2d at 1369.

Judicial remedies for failure to provide the requisite § 363(b) notice have not been uniform. The most common remedy has been to set aside the sale, or treat the sale as voidable, usually at the option of the creditor or interested party who unjustifiably failed to receive notice of the sale. *See M.R.R. Traders, Inc. v. Cave Atlantique, Inc.,* 788 F.2d 816, 818 (1st Cir.1986); *Zalevsky v. Steele,* 78 B.R. 100, 102, 103–04 (W.D.Pa.1987); *In re Winstead,* 33 B.R. 408, 411 (M.D.N.C.1983); *In re Sanders,* 91 B.R. 317, 323 (Bankr.E.D.Pa.1988); *In re*

*F.A. Potts & Co., Inc.,* 86 B.R. 853, 859, 863 (Bankr.E.D.Pa.), *aff'd,* 93 B.R. 62 (E.D.Pa.1988); *Fernwood Markets, supra,* 73 B.R. at 619 (and cases cited therein); and *In re Century Steel, Inc.,* 56 B.R. 268, 270 (Bankr.M.D.La.1985).

However, this court and other courts also have molded alternative remedies for violations of § 363(b), based upon the facts before them. In *In re Tigue,* 82 B.R. 724 (Bankr.E.D.Pa.1988), this court was confronted by a factual matrix wherein an attorney of a debtor who was incarcerated in an institution for the criminally insane bought property of the debtor without providing § 363(b) notice to the debtor. Unlike the archetypal § 363(b) case, where the predominant issue was failure to proffer notice to interested parties, that controversy was further exacerbated by our finding of the attorney's unethical behavior vis-a-vis the debtor; the enhancement in value of the property due to improvements made by the attorney; and the fact that, but for the attorney's unethical acquisition of the property, the property would have been sold at a sheriff's sale, hence depriving the debtor of any type of interest in the property. *Id.* at 731–36. Based upon these considerations, this court was loathe to set aside the transfer of the property to the attorney, yet strongly compelled to fashion some type of equitable remedy in light of the attorney's unethical conduct. As a result, in *Tigue,* the unauthorized sale was not set aside. Rather, the attorney was required to disgorge

> the financial benefit which he personally gained from the transaction to the [d]ebtor as the [d]ebtor's sole remedy ... [as] measured by the difference between the fair market value of the [p]roperty on ... the date of the sale to the [attorney], and the amount paid by the [attorney] to acquire [the property].

*Id.* at 736.

In *In re New York City Shoes, Inc.,* 89 B.R. 479, 484 (Bankr.E.D.Pa.1988), *later Order rev'd on other grounds,* 1990 WL 126121, 1990 U.S. Dist. LEXIS 11315 (E.D.Pa. Aug. 23, 1990), the chief financial officer ("the CFO") of a reorganizing debt-

or sold 30,000 pairs of "warehouse" shoes without bankruptcy court approval and without having provided F.R.B.P. 2002(a)(2) notice to any interested party. The price at which the shoes were sold was $.40 per pair. Although the undisclosed sale could have been ruled voidable, or possibly void, this course was not taken because the unsecured creditors' committee, which protested the sale, did not seek to set aside the sale. *Id.* The Committee's posture was apparently motivated by the fact that, although the sale occurred without the requisite notice and approval, the sale did generate money for the debtor's estate, albeit at a price which the unsecured creditors' committee considered deflated. The relief provided by this court was that the CFO was assessed damages based upon the "estimated potential damage to the estate" as a result of the lack of notice. *Id.* A witness testified that, had he received notice of the sale, he would have bid on the shoes, and that he believed the shoes were worth between $2.75 and $3.50 per pair. Based partially upon this testimony, we determined that, had the witness received notice of the undisclosed sale, he would have paid at least $1.00 per pair for the shoes. Thus, the damage to the debtor estate resulting from the undisclosed sale was assessed at $18,000.00, the difference between the court-determined figure for 30,000 pairs of shoes, $30,000.00, and the amount actually received for the shoes, $12,000.00.

In *In re Lundy*, 110 B.R. 300 (Bankr. N.D. Ohio 1990), following issuance of a bankruptcy court order authorizing its sale, the debtors sold residential property to a third party, in an "arm's length" transaction, without serving § 363(b) notice upon their mortgagee on the property, the Federal National Mortgage Association ("FNMA"). The property was sold to the third party for $38,000.00, although its fair market value appeared to be between $45,-000.00 and $48,000.00. The proceeds from the sale were used to satisfy the prior first mortgage and most of the second mortgage on the property, after which only $25.44 remained.

The court found that FNMA had received inadequate notice of the sale of the property. *Id.* at 301–02. However, the court did not set aside or avoid the sale. Rather, it recognized that the debtors no longer had a continuing interest in the property, that the property apparently was now owned by another party who had encumbered it with a new mortgagee after the sale, and that the property was no longer part of the debtor's estate. Therefore, the court reasoned that it could not set aside the sale, since "[i]t has been executed and persons or entities other than the [d]ebtors presumably derived their interest in the Property through the [s]ale [o]rder." *Id.* at 304. The court held, *inter alia,* that the sale would not be set aside and that FNMA was relegated to relief against the debtors only. *See also In re Edwards*, 962 F.2d 641 (7th Cir.1992) (interests of sole purchaser and junior mortgagee who failed to receive notice of sale weighed; sale not set aside).

Based upon the facts before this court, it is unequivocally clear that the Debtor failed to provide notice, as required by § 363(b) and F.R.B.P. 2002(a)(2), to *any* interested party and sold the Mercedes without notice and hearing. If CoreStates had not mistakenly satisfied its security interest, its interests would have been preserved by 11 U.S.C. §§ 363(e) and (f), which protects parties with security interests by requiring the trustee (or the debtor) to provide adequate protection, to garner the secured party's consent, and/or to persuade secured party to accept monetary satisfaction for its interests if the secured property is sold free and clear of liens. However, CoreStates was not secured at the time of the sale and, as we hold at pages 718–720 *infra,* it cannot achieve reinstatement of its lost security interest. Nevertheless, even as an unsecured creditor, CoreStates has standing to challenge the validity of the Debtor's sale of the Mercedes to D'Angelo under § 363(b).

Rather than following that portion of case law which simply sets aside, or avoids, transactions violative of § 363(b), this court chooses to adhere to the approaches of *Tigue, New York City Shoes,* and *Lundy,* which fashioned remedies based upon the unique factual matrices underlying the respective controversies. As a result, although this court finds that the sale of the

Mercedes should be set aside, its remedy takes into consideration the following: (1) the interest of D'Angelo, since there is no evidence that he was aware of the unauthorized nature of the sale; (2) the interest of the Debtor's estate, which includes the Mercedes among its assets; (3) the interests of the creditors and other interested parties who were not given notice of the unauthorized sale; and (4) the Debtor's unauthorized actions.

A significant factor which motivates this court's decision to set aside the transfer of the Mercedes is its finding that the Debtor's estate would be deprived of a valuable asset if D'Angelo were to be permitted to retain the Mercedes. Despite the Debtor's testimony and the exhibits offered by D'Angelo, and although none of the evidence offered to prove the Mercedes' value was singularly determinative, it is clear that the Mercedes was worth more than the $6,500.00 for which it was sold to D'Angelo. This is evidenced by the Debtor's Chapter 13 Statement, wherein he listed the value of the Mercedes as $17,000 *after* the two accidents and the resultant repair work which supposedly had significantly decreased its value. The declarations of Earnhart, while not objected to as the hearsay that they were, are, for that reason, of poor quality and not entitled to much consideration. The Radio was apparently missing before the sale of the Mercedes to the Debtor took place and was apparently already reflected in the price. It is unclear why Earnhart would have any knowledge of, or reason to comment upon, damages which occurred to the Mercedes after her company sold it to the Debtor. The fact that the Debtor sold the Mercedes privately to D'Angelo, a long-time friend, so quickly after receiving the Title appears indicative of a "sweetheart deal" to unload a "hot" item as quickly as possible, with price being a purely secondary consideration.

For all of these reasons, this court will not allow the Mercedes to remain with D'Angelo. Despite the purported "separateness" of the transactions involving the Mercedes and the other Vehicles, we consider them as one which must be set aside in its entirety. We will order the Debtor to return the Vehicles and the $500 difference in the "sale" price to D'Angelo. We will also allow D'Angelo to recover any extraordinary amounts that he can prove that he expended in enhancing the Mercedes since the transfer and further credit him for any damages, other than the normal "wear and tear," to the Vehicles as a result of their usage by the Debtor. Also, D'Angelo shall be required to reimburse the Debtor for any extraordinary amounts spent by him to enhance the Vehicles, and D'Angelo shall be required to pay to the Debtor's estate any provable amounts resulting from damage, other than the normal "wear and tear," from his usage of the Vehicles. However, all such claims must be made on or before June 30, 1992, or within ten days of the return of the respective vehicles, whichever is later.

We question whether D'Angelo deserves protection. While there is no direct evidence of his knowledge of the underlying operative facts between the Debtor and CoreStates, it is difficult to believe that he was entirely ignorant of them. He was a long-time business acquaintance and, we must assume, a confidant of the Debtor. Obtaining the Mercedes at a price which appears far less than half its value was itself a sufficient fact to put him on notice that this deal was too good to be true and might be invalidated.

On the other hand, there is no evidence that D'Angelo knew that the Debtor was in bankruptcy, much less understand the ramifications of § 363(b) and F.R.B.P. 2002(a)(2) to this transaction. There is no reason to punish D'Angelo. He should be made as whole as possible, given the circumstances and his role in them.

We also note that the transfer of the Mercedes to D'Angelo was readily avoidable by the Trustee pursuant to 11 U.S.C. § 549(a), which reads as follows:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2) ... (B) that is not authorized under this title or by the court.

Based upon the foregoing, it would appear that the Trustee could avoid the transfer of the Mercedes, since the transfer occurred seven months after the filing of the Petition and was not authorized by this court or by any statutory section of the Bankruptcy Code. In fact, as is shown *supra*, it was violative of § 363(b) and F.R.B.P. 2002(a)(2). On these bases alone, the Trustee would be empowered to avoid the Debtor's transfer of the Mercedes if the trustee had so moved. *See In re Shapiro*, 124 B.R. 974, 981 (Bankr.E.D.Pa.1991); and *In re 222 Liberty Associates*, 110 B.R. 196, 203 (Bankr.E.D.Pa.1990).

We also note that 11 U.S.C. § 549(c) protects only good faith purchasers of "real property" from the effects of avoidance under 11 U.S.C. § 549(a). Therefore, 11 U.S.C. § 549(c) could not have protected D'Angelo. The result under a § 549(a) analysis is thus the same as per our analysis under § 363(b).

Finally, we address the issue of the disposition of the Mercedes, vis-a-vis the Debtor and the Trustee. As we noted at page 711 *supra*, the Debtor claimed only a $1,000 exemption in the Mercedes. Since the Mercedes was acquired by the Debtor prior to the filing of his bankruptcy case, it is clearly property of the Debtor's estate. 11 U.S.C. § 541(a)(1). *See Taylor v. Freeland & Kronz*, —— U.S. ——, 112 S.Ct. 1644, 1647, 118 L.Ed.2d 280 (1992).

We note that "[t]he Code, ... allows the debtor to prevent the distribution of certain property by claiming it as exempt." *Id.* *See* 11 U.S.C. § 522(1). Although *Taylor*, *supra*, 112 S.Ct. at 1648–49, holds that a debtor's exemption claims are protected if no timely objections thereto are filed, *Payne v. Wood*, 775 F.2d 202, 204 (7th Cir.1985), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986), holds that

> [i]f the debtor does not claim an exemption with respect to particular property, the rule of inclusion stated in § 541 controls, and the property goes to the creditors. *In re Friedrich*, 100 F. 284 (7th Cir.1900); *Gardner v. Johnson*, 195 F.2d 717 (9th Cir.1952); *In re Guerrero*, 30 B.R. 463 (N.D.Ind.1983); *In re Elliott*, 31 B.R. 33 (Bankr.S.D. Ohio 1983).

*See also In re Wax, Wax v. Wax*, Bankr. No. 91–11414S, Adv. No. 92–0169S, slip op. at 11–12, 1992 WL 122899 (Bankr.E.D.Pa. May 29, 1992); *In re Roberts*, 81 B.R. 354, 363 (Bankr.W.D.Pa.1987); and *In re Fox*, 80 B.R. 753, 757 (Bankr.W.D.Pa.1987).

While the Debtor might seek to amend the exemptions claimed in his Chapter 13 Statement to add any increased value of the Mercedes thereto, his exemption limit in the Mercedes may not exceed $1,200 under 11 U.S.C. § 522(d)(2). An attempt could be made by the Debtor to make an additional exemption claim under 11 U.S.C. § 522(d)(5). However, any proffered amendment to his exemptions by the Debtor would trigger a new objection period. *See* F.R.B.P. 4003(b). If the court should find that the Debtor acted wrongfully in his attempt to dispose of the Mercedes, which is likely, such an amendment may be prohibited. *See Payne, supra*, 775 F.2d at 205; *Wax, supra*, slip op. at 12–13; and *In re Shaffer*, 92 B.R. 632, 634–36 (Bankr. E.D.Pa.1988), *aff'd*, C.A. No. 88–9742 (E.D.Pa. April 10, 1989).

2. PURSUANT TO PERTINENT STATE LAW, CORESTATES NO LONGER HAS A SECURED INTEREST IN THE VEHICLE, AND IT WOULD BE IMPROPER FOR THIS COURT TO REINSTATE ANY SUCH SECURITY INTEREST.

The procedure for evidencing satisfaction of a security interest for a motor vehicle, where there are no subsequent liens, is clearly provided as follows in 75 Pa.C.S. § 1135(a):

> (a) **Absence of subsequent liens.—** Where there are no subsequent liens upon a vehicle, the following rules apply upon the satisfaction of a security interest in the vehicle:

> (1) The outstanding certificate of title shall be mailed or delivered immediately to the owner of the vehicle with proper evidence of satisfaction and release or the lienholder may apply for corrected title to be issued in the name of the owner.

(2) The owner may mail or deliver the certificate of title with proper evidence of satisfaction of the security interest to [the Department of Transportation of the Commonwealth] which shall issue a corrected certificate of title without a statement of liens or encumbrances. The corrected certificate of title may also be issued when the outstanding certificate cannot be returned and proper evidence is produced that all recorded security interests have been satisfied.

The actions taken by CoreStates to satisfy its lien, though committed in error, were in full compliance with, and brought to bear the binding effect of, the aforesaid statutory law. As conceded by CoreStates, it satisfied its security interest in the Mercedes by marking "paid" on the Contract and forwarding of it and Title to the Debtor. The far-reaching effects of this concession is evidenced by Pennsylvania caselaw which holds that even a mistaken delivery of an automobile title marked "satisfied" deprives even a court of equity of the ability to restore the encumbrance to the title, or to return of the vehicle to the party committing the mistake. *See Eastern Acceptance Corp. v. Deabler*, 59 MONTG. CO. L. RPTR. 264 (Montgomery Co. C.P. 1943); and *Associates Discount Corp. v. Debies*, 90 P.L.J. 569 (Allegheny Co. C.P. 1943).

■ CoreStates argues that, since it "mistakenly" satisfied its own security interest, and this court is a court of equity, we should undo its "mistake" and reinstate its security interest. We cannot do so. Security interests are creatures of statute and exist only if there is strict adherence to the provisions of the statutes which create them. Once a security interest is satisfied, its existence is irrevocably terminated. *See In re Apollo Travel, Inc.*, 567 F.2d 841, 843–45 (8th Cir.1977); and *In re Windsor Communications Group, Inc.*, 45 B.R. 770, 775–76 (Bankr.E.D.Pa.1985).

As the two foregoing cases indicate, the policy of requiring rigorous compliance with statutory requirements to retain security interests has particular strength in the context of bankruptcy, where the beneficiary of a secured party's errors in recording is generally not the debtor, but other,

often equally-innocent creditors. For this reason, the Bankruptcy Code provides that a trustee has extraordinary avoidance powers, not only under 11 U.S.C. § 549, but also under 11 U.S.C. §§ 544–48 as well. In many instances, mere failures of secured parties to properly record documents have been determined to be absolutely fatal to secured claims. *See, e.g., McLean v. City of Philadelphia, Water Revenue Bureau*, 891 F.2d 474, 476–80 (3d Cir.1889); *In re Capital Center Equities*, 137 B.R. 600, 608–14 (Bankr.E.D.Pa.1992); and *In re Rice*, 133 B.R. 722, 725–28 (Bankr.E.D.Pa. 1991). It is difficult to see how the "equities" run in favor of CoreStates, since its employee, without fraud or prompting from the Debtor, set the entire unfortunate course of events into motion. Therefore, it is impossible for CoreStates to justify the truly extraordinary relief which it seeks.

■ As to reinstatement of CoreStates' lien on the grounds of unjust enrichment to the Debtor and to the general unsecured creditors, CoreStates has failed to prove that the requisite elements are present. Proof is required that the

' "benefits conferred on [the recipient ...] by [the party performing the services], appreciation of such benefits by [the recipient], and acceptance and retention of such benefits under such circumstances that it would be inequitable for [the recipient ...] to retain the benefit without payment for value." '

*In re Stendardo*, 139 B.R. 128, 132 (E.D.Pa.1992), quoting *Burgettstown–Smith v. Langeloth Townsite Co.*, 403 Pa.Super. 84, 88–89, 588 A.2d 43, 45 (1991), quoting in turn *Wolf v. Wolf*, 356 Pa.Super. 365, 374, 514 A.2d 901, 905–06 (1986).

In light of our disposition that the Mercedes must be turned over to the Trustee rather than to the Debtor, it can be seen that little benefit was conferred upon the Debtor by his actions. By virtue of the inadvertent satisfaction of the Title, the Mercedes becomes an unencumbered asset of the Debtor's estate from which all unsecured creditors, including CoreStates, can share a recovery.

The Debtor's other unsecured creditors have committed no act which would render

the circumstances of their recovery of proceeds from the Trustee's likely future disposition of the Mercedes inequitable. There appears to be no windfall to the unsecured creditors which is any greater than in any other circumstances where unsecured creditors are the beneficiaries of a trustee's employment of "strong arm" powers.

CoreStates' invocation of 11 U.S.C. § 105(a) is, as is often the case when application of this Code section is urged, a desperate plea for this court to do that which the applicable law does not authorize. As the Court of Appeals cautioned in *In re Morristown & E. R.R.*, 885 F.2d 98, 100 (3d Cir.1989); and *Southern Ry. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir.1985), powers under § 105(a) must be applied in a manner consistent with applicable law, and not " 'as a loose cannon to support otherwise insupportable claims.' " *In re Amatex Corp.*, 97 B.R. 220, 225 (Bankr. E.D.Pa.), *aff'd sub nom. Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411 (E.D.Pa. 1989), quoting *In re Latimer*, 82 B.R. 354, 364 (Bankr.E.D.Pa.1988). The contrary policies of 11 U.S.C. §§ 544–49 counteract any sympathy which we might have for CoreStates' position.

### D. CONCLUSION

An Order consistent with the foregoing Opinion will be entered.

### ORDER

AND NOW, this 15th day of June, 1992, upon consideration of the Motion of CoreStates Bank, N.A. ("CoreStates") to Reinstate First Lien in Favor of First Pennsylvania N.A. on 1988 Mercedes Benz V.I.D. No. WDBDA29D1JF493717 and CoreStates' Amended Motion to Reinstate Lien, it is hereby ORDERED as follows:

1. The Motions are GRANTED in part and DENIED in part.

2. The sale of the instant 1988 Mercedes Benz, Vehicle Identification Number WDBDA29D1JF493717 ("the Mercedes"), by the Debtor, LEONARD CAVALIERI ("the Debtor"), to Anthony L. D'Angelo, Sr. ("D'Angelo") is hereby DECLARED null and void, as violative of 11 U.S.C. § 363(b) and Federal Rule of Bankruptcy Procedure 2002(a)(2).

3. D'Angelo shall turn over the Mercedes to EDWARD SPARKMAN ("the Trustee") on or before June 18, 1992.

4. LEONARD CAVALIERI ("the Debtor") shall deliver a certain Maxima automobile and a 1988 Ford truck ("the Vehicles") to D'Angelo and pay to D'Angelo the sum of $500.00 on or before June 18, 1992. The inability of the Debtor to pay the $500 shall not excuse the Debtor from the duty to effect delivery of the Vehicles to D'Angelo.

5. D'Angelo is allowed until June 30, 1992, to file and serve upon the Trustee any claim of extraordinary enhancement of the Mercedes during the period of time that it was in his possession, and is allowed until June 30, 1992, or ten days after the delivery of the Vehicles to him, whichever is later, to make a claim for any damages to the Vehicles against the Debtor.

6. The Trustee shall be allowed until June 30, 1992, or ten days after the receipt of the Mercedes, whichever is later, to make any claim for damages to the Mercedes against D'Angelo.

7. The Debtor shall have until June 30, 1992, to make any claim against D'Angelo of extraordinary enhancement of the Vehicles.